Stanley **ZAITCHICK** and Victoria Zaitchick, Plaintiffs,

v.

**AMERICAN MOTORISTS INSURANCE CO., Defendant.**

**No. 81 Civ. 6254 (KTD).**

United States District Court, S.D. New York.

Dec. 28, 1982.

Louis Tieger, P.C., Monticello, N.Y., for plaintiffs.

Whitman & Ransom, New York City, for defendant; Frederic R. Mindlin, New York City, of counsel.

OPINION

KEVIN THOMAS DUFFY, District Judge:

On the morning of Thursday, November 6, 1980, at approximately 7:30 a.m., Paul Walsh, a local Glen Wild, New York gas station owner and chief of the local volunteer fire department sat down to his breakfast at the Rockhill Diner. At the same time, Robert Hankins was jogging past East Glen Wild Road when he noticed heavy smoke rising from among the trees. Responding quickly, he telephoned the volunteer fire department, which handled all fires in the area. The postman, also notified of the fire, hastened over to the Rockhill Diner, knowing that Paul Walsh would still be there enjoying his breakfast. Upon being alerted by the postman to the probable fire, Walsh dashed for his car. The alarm sounded at approximately 7:44 a.m.

Walsh, a member of the fire department for over eight years, was the first volunteer fireman to arrive at the East Glen Wild Road home of Stanley and Victoria Zaitchick. Upon his arrival he noticed heavy black smoke billowing out of the left hand side of the single story home. Mr. Resnick, a nearby neighbor, had arrived at the burning house one minute before Mr. Walsh. As Walsh arrived, Resnick was attempting to enter the Zaitchick home on the right-hand side by the garage to determine whether anyone was in the house. Fortunately, no one was home. Within minutes, thirty volunteer firemen were battling the fire with five pieces of apparatus. Despite their strenuous efforts, nearly eight hours elapsed before the fire was extinguished. The house and its contents were completely destroyed.

The home owners, Stanley and Victoria Zaitchick, were first notified of this disaster three days later, on November 9, 1980, while they were vacationing in Sierra Vista, Arizona. The Zaitchicks had left Glen Wild, New York on October 31, 1980, to spend part of Mr. Zaitchick's hard-earned sabbatical with their son. Their son was stationed in Arizona, and had a one week leave from the armed services. The morning after he learned of the fire, Mr. Zaitchick contacted his insurance broker, Max Gersten of the Gersten Hillman Agency, Inc. in Monticello, New York. Within an hour, Mr. Gersten reported back to Zaitchick that his home and its contents were totally lost. With Mr. Zaitchick's daughter in New York taking care of most of the pressing matters, the Zaitchicks tried to enjoy the remainder of their visit with their son. After their son's one week leave ended, the Zaitchicks flew to a relative's home in Florida on November 24 to continue their vacation.

During this same time, on November 11, 1980, the fire insurer of the Zaitchick home, American Motorists Insurance Company of Kemper Insurance, had sent its general adjustor, William Parish, and a cause and origin of fires expert, George O'Dell, to investigate the premises. They took several photographs, made measurements, and attempted to examine the remains, a procedure rendered difficult by the freezing weather and the lack of adequate tools. Amid the debris they were able to find the remains of a stereophonic high fidelity

sound system, two television sets, a washer and dryer, a refrigerator, a freezer, some electrical tools, and other valuable goods. They decided to return later.

The insurance investigators returned to the Zaitchick home on November 17, 1980. Since their earlier visit, warmer temperatures had loosened the frozen remains of the home and now allowed the investigators to dig into the burned debris. They began digging in the front of the home in the basement and continued to the oil burner in the back of the house. In their exploration, they uncovered a powdered layer of cement near the burner. The powdered concrete crossed the floor from the oil burner to the back wall. It was near the back wall that the investigators apparently discovered a large clump of rags that Parish stated at trial had a strong odor of a petroleum product. Mr. O'Dell gathered a few of the rags and placed them in a clean, empty paint can, a commonly-used receptacle for potential evidence collected by insurance investigators. A few pieces of charred board, burned at the base of the back wall were also placed in the paint cans for future analysis. Mr. O'Dell and Parish then placed a tarp over the excavated area.

The New York State Police Bureau of Criminal Investigation ("BCI") also investigated the Zaitchick fire after being contacted by Paul Walsh on the day of the fire. Walsh's suspicions, which resulted in his calling in this state agency, had been aroused by various factors: first, he found "dogs" or tags in the power box indicating that the electrical power had been shut off; second, because the fire occurred during the winter months, the possibility of spontaneous combustion was minimized; third, the home was vacant at the time of the fire, and fourth, there was no obvious accidental source of the fire.

Unfortunately, the state police investigators apparently were prevented from searching the premises in depth on the day of the fire due to the heat and unsafe condition of the smoldering remains. It was not until eighteen days later, on November 24th, that BCI Officer Robert Hughes made his first extensive on-site investigation. Meeting insurance investigators O'Dell and Parish at the scene, Officer Hughes inspected the charred debris, including the clump of rags uncovered by Parish and O'Dell. Hughes also noted the petroleum odor exuded by the rags. O'Dell and Parish stated that they would send Officer Hughes the results of the laboratory tests conducted on the rags already sent off for analysis.

The following day, Officer Hughes called Zaitchick in Florida to find out when he would be returning to New York so that they could discuss the fire. Zaitchick stated that possibly he could return in April. Officer Hughes, however, "explained to him that it would be necessary to speak to him before that because [he] had determined that the possibility existed that the fire was not accidental in nature, but possibly purposely set . . . ." Trial Transcript of Officer Hughes at 11. Zaitchick responded that he would try to return sooner. Becoming suspicious of Zaitchick's calm reaction to the devastating fire, Officer Hughes asked Zaitchick why he did not return immediately to New York upon learning that he had lost his residence and his belongings. Zaitchick replied that "he had not seen his son for a while and he wanted to spend a few more days with his son." Id. 12. Moreover, because the fire had completely destroyed his home, Zaitchick said " '[w]ell, what can you do?' " Id. 13.

One week later, Stanley Zaitchick travelled to the New York State Police facility at Ferndale, New York. The interview provided "no helpful information" or leads to the police. Defendant's Exhibit K. Zaitchick knew of no enemies, and confirmed that the electricity and the oil burner had been shut off before the fire occurred. Officer Hughes continued his investigation over the following six months, interviewing various witnesses and periodically checking with Parish. Hughes never received the laboratory results from Parish concerning the possibility that gasoline or some other accelerant was discovered in the clump of rags. On May 28, 1981, with "no new leads, sus-

pects, evidence [and with] [a]ll avenues of possible investigation ... exhausted," Officer Hughes closed the case. *Id.* O'Dell, the cause and origins expert, also left the cause of the fire undetermined before leaving the employ of Kemper. Last, Chief Walsh was unable to determine the cause of the fire.

On February 19, 1981, Stanley and Victoria Zaitchick filed sworn proof of loss statements for the limits of their policy coverage of the house ($70,000) and its contents ($49,000).[1] Defendant's Exhibits B & C. Defendant demurred on the insured's request for payment. This suit followed to recover the maximum amounts under the insurance policy.

## I.

### LIABILITY

It is undisputed that plaintiffs have met their various contractual duties required by the insurance contract, such as timely notice of the fire and sworn statements documenting proof of loss. Thus, defendant is liable under the insurance contract unless it is able to prove either of the two defenses it has asserted: fraudulent exaggeration of claim and/or arson. I find that defendant has not proven either of these defenses.

### A. Fraudulent Exaggeration of Claim

■ Defendant claims that the only competent evidence at trial established a $37,000 cash value—cost less depreciation—for the Zaitchick home, whereas the Zaitchicks are claiming $70,000. This 89 percent increase, defendant alleges, is sufficient to support a finding of fraud. The flaws in the defendant's argument are two-fold.

First, assuming *arguendo* that actual cash value was $37,000, a bald comparison to plaintiffs' $70,000 claim is recklessly misleading. Plaintiffs seek the replacement value guaranteed by the insurance contract, not actual cash value. A $70,000 replacement claim was supported at trial by expert

testimony by Mr. Obler.[2] It is to be expected, after a number of years of high inflation, that the replacement cost will be much higher than the actual cash value.

Second, any allegation of fraud is baseless absent proof of intent. *Sunbright Fashions, Inc. v. Greater Mut. Ins. Co.,* 310 N.Y.S.2d 760, 34 A.D.2d 235, *aff'd,* 319 N.Y.S.2d 609, 28 N.Y.2d 563, 268 N.E.2d 323 (1970). Defendant relies, in addition to the putative 89 percent claim exaggeration, on plaintiffs' use of an expert, Mr. Obler, who allegedly used an inappropriate method of calculating replacement cost to support a finding of the plaintiffs' fraudulent intent. Even were I to accept defendant's arguments, the combination of an incorrect method of computation and a good faith exaggeration of a claim is not sufficient evidence of fraudulent intent. *See Saks & Co. v. Continental Ins. Co.,* 295 N.Y.S.2d 668, 23 N.Y.2d 161, 242 N.E.2d 833 (1968).

### B. Arson

■ Defendant's answer states:

Acting alone or with one or more other persons, the plaintiffs wilfully and deliberately set or caused one or more such other persons to set [sic] to the property listed on the American Motorists policy and located at East Glen Wild Road, Glen Wild, New York on or about November 6, 1980, so as to obtain by fraudulent means the proceeds of the American Motorists policy by reason of which the plaintiffs are not entitled to recover from American Motorists for any of their alleged loss or damage.

This defense fails for several reasons: (1) defendant has not proven by a preponderance of the evidence that the fire was of incendiary origin; (2) defendant has failed to show plaintiffs' involvement in the alleged setting of the fire; and (3) defendant has offered insufficient proof of plaintiffs' motive for setting the fire.

1. Their total alleged fire damages were $100,862 for the structure and $52,696 for the property inside the house.

2. The question whether defendant is liable for replacement value or actual cash value is one I turn to later in this opinion. *See infra* section II.

### (1) Incendiary or Accidental?

Defendant's arson defense is dependent principally on the testimony of John Connell, a well-qualified arson expert. Mr. Connell was asked to draw conclusions based on both direct and circumstantial evidence before the court. After assuming that there was spalling or powdering of concrete on the basement floor, an odor of petroleum on the day of the fire, gasoline soaked rags, certain observable burn patterns, the absence of electricity or people in the house, black smoke, and the forcing of several doors, Connell concluded that the fire had an incendiary origin. Connell then explained his opinion. The spalling of concrete is caused by a rapid increase in the temperature next to the concrete, typically associated with the lighting of a flammable petroleum product. The Connell theory of incendiary origin is also consistent with defense exhibit G–3 that shows certain burn patterns at the base of the basement wall near the clump of rags. The heavy black smoke spewing from the house noticed by several witnesses suggests the burning of petroleum in imperfect conditions. The burning of such a petroleum product would free carbon, resulting in distinctively heavy black smoke. Connell also noted that the aluminum on the furnace had burned and the nozzle had melted. Both were unusual, and indicated that the fire began either under or very close to the shut-off furnace.

The testimony of Connell falls short of proving the fire was intentionally set. One problem is that Connell's assumptions are not fully supported by the evidence. For example, little physical evidence supports defendant's claim that there were gasoline soaked rags at the scene. There was some testimony by Officer Hughes of such rags, but he visited the scene eighteen days after the fire.[3] Insurance investigator Parish testified that he discovered these allegedly incriminating rags eleven days after the fire. Moreover, Parish did not support this discovery with any of the laboratory analysis that was done. In addition, the clump of rags cannot be identified in any of the pictures of the fire scene.[4] The existence of these rags, as well as the allegation that the rags were soaked with an accelerant, is thus thrown into doubt. If the defendant had such evidence, it certainly was not produced at trial nor was any explanation given for its absence.

A second problem is that Connell supports his conclusion with facts that are explained easily by other phenomena. For instance, he cites the distinctive burn patterns. Officer Hughes, however, agreed that these patterns could have occurred spontaneously when the siding on the wall burned off and collapsed. Trial Transcript of Officer Hughes at 37–38. Decreased air flow between the wall and the floor where the buck sits during a fire provides an innocent and plausible explanation for the burn patterns. The powdering of the concrete floor may also have been caused by an accidental, yet rapid increase in temperature.[5] With these considerations in mind, I conclude that the defendant has failed to prove by a preponderance of the evidence that the fire was purposely set.

### (2) Plaintiffs' Alleged Role in Causing the Fire

Defendant has failed to produce *any* credible evidence connecting the plaintiffs to the fire's origin. In its post-trial memorandum, defendant asserts that because the premises were locked and plaintiffs were

3. Officer Hughes admitted that the rags he found eighteen days after the fire on premises unsecured throughout that period, were so inherently unreliable that he believed the evidentiary rules would prohibit their admission. Trial Transcript of Officer Hughes at 28.

4. Defendant's Exhibits G–5 & G–8, two photographs, show a few remnants of clothing. These are not, however, a "clump"; moreover, a bedroom containing clothing was on the level

that collapsed directly over the spot on which the rags were found, and could well have been the source of these fragments. *Compare* Defendant's Exhibit E *with* Defendant's Exhibit I.

5. *Of course, Connell was not relying on any one factor alone in reaching his conclusion that the fire was incendiary in origin. The reliability of too many factors supporting his analysis is questionable, however, placing his conclusion in doubt.*

the only ones with keys, the fire was started by someone given access by plaintiffs.[6] This assertion of plaintiffs' involvement, unsupported by credible evidence, does not satisfy defendant's burden of showing plaintiffs were involved in the alleged arson.

First, as noted above, defendant has failed to prove that the fire was incendiary in origin. It also is unclear whether the house was locked shut at the time of the fire. Mr. Zaitchick testified that the back door was locked when he left in late October, and some further testimony was elicited that the front and garage door were locked. This testimony, however, does not reveal whether any windows were open at the time of the fire, forced or otherwise, whether the back door may have been forced open at some time after Zaitchick left Glen Wild, or whether the third door by the garage was locked.[7] The unsupported assertion that the plaintiffs allowed an arsonist access to their home has not been proven by a preponderance of the evidence and thus cannot stand as a defense to the plaintiffs' case.

### (3) Intent

Defendant further failed to prove that plaintiffs had the requisite intent to commit arson. Defendant contends that it has laid out the "building blocks" needed to establish plaintiffs' motive and intent. At trial, however, defendant's summation of the credible evidence on the issue of intent did not even reach the foundational stage. For example, Parish, defendant's investigator, answered in response to questions about the

plaintiffs: "we found out he has a long way to go to work, nothing spectacular." Certainly, a two hour commute each way to and from work is a substantial amount of travelling. Zaitchick, however, had been making the commute from Glen Wild to New York City for over eight years at the time of the fire.[8] Moreover, I find implausible defendant's suggestion that the plaintiff, then 66 years old, risked criminal penalties and loss of his home and possessions in order to cut down his commute. Even if the market were depressed, as the defendant suggests, plaintiffs were free to sell their home without incurring risks and without resorting to arson in order to shorten Zaitchick's daily commutation.

The defendant in its Post-Trial Memorandum has asserted that other evidence of motive was brought out at trial. These additional reasons provided by defendant are frivolous, and can be dismissed in brief.

First, defendant finds support in the alleged fraudulent exaggeration of plaintiffs' claims for its assertion of motive. I already have found that there was no such fraudulent exaggeration.

Second, defendant claims that "only a person aware that his house would burn to the ground would exhibit such a cavalier disregard for the loss of all of his worldly possessions." *Id.* 13. I, however, found his explanation credible, reasonable, and persuasive. He was far away from home on a hard-earned sabbatical, planned months before the fire, with a son he had not seen in some time. As Zaitchick himself said, what point would be served by an immediate

---

**6.** Defendant thankfully does not assert that plaintiffs personally set fire to their own home—save in its pleadings—since plaintiffs clearly were thousands of miles away on the morning of November 6, 1980.

**7.** Some testimony establishes that Mr. Resnick, the first person to reach the house, had forced a door by the garage. It is unclear, however, whether this door was the third door, the garage door—since he determined no one was home by the absence of an automobile—or to what extent the door had to be forced open.

**8.** During that time, Mr. Zaitchick did not commute each way every year. In 1974–75 he lived

in Manhattan. In addition, for the period of January to mid-April from 1972–74 he lived in Manhattan, commuting up to his Glen Wild home on weekends. I must note from these facts that despite the defendant's claim that Mr. Zaitchick's detest for the commute drove him to commit arson, Mr. Zaitchick actually has commuted more, not less, in the past few years. Defendant also did not produce any evidence concerning Victoria Zaitchick's possible involvement or motive in the alleged arson. Therefore, this discussion, like defendant's defense, focuses on Stanley Zaitchick alone.

return to New York. He could not reconstruct the house himself. It is not a sign of guilt that the plaintiffs chose to stay on their vacation, at a savings of several hundred dollars in air fare, and to forego examination of the charred and worthless remains of their worldly possessions. It is a sign, rather, of level-headed, rational thought. Furthermore, they had their daughter back in New York taking care of all that was necessary.

Defendant also alleges that the Zaitchicks' dissatisfaction with the construction of their home, which led to the installment of additional insulation, was further motive to commit arson. I do not find this argument persuasive. The high cost of energy has forced many homeowners to attempt to reduce utility bills with such energy-saving measures. This assertion by the defendant, moreover, misstates the evidence adduced at trial. In fact, the evidence suggested that the plaintiffs were pleased with their home, and had done much toward improving and maintaining the landscape surrounding their home. Testimony of William Rieber.

Defendant states that "there can be no dispute that the plaintiffs came forth with no credible evidence whatsoever that anyone else had a motive to burn their premises intentionally." Defendant's Post-Trial Memorandum at 12. I need only remind defendant that on the issue of motive and intent the burden of proof remains with the defendant at all times. This burden has not been carried; in fact, substantial evidence negates the existence of motive.

Defendant admits that financially the plaintiffs were not struggling. The Zaitchicks had money in their bank account, and their mortgage and tax liabilities were paid on time. Moreover, Mr. Zaitchick was only two years away from receiving a pension earned during his twenty plus years of teaching. Therefore, there is nothing in Zaitchicks' financial condition from which to infer the requisite intent.

Plaintiffs' activities prior to the fire also belie an intent to commit arson. It is unchallenged that the Zaitchicks shut off the water in the house, emptied the water pipes, poured a small amount of kerosene into the bathtubs and sinks to act as antifreeze, and shut off the electricity and the oil burner. The shutting off of the oil burner and the electricity were corroborated by independent evidence. Such meticulous preparation for an extended vacation is inconsistent with the defendant's arson claim. Furthermore, an arsonist would be more likely *not* to turn off the oil and electrical power in order to preserve the greatest number of sources that could be wrongly identified as the accidental origin of the fire.

In further derogation of the defendant's case, its own investigator admitted that when a homeowner sets fire to his or her own home, two principal clues looked for by the insurance company are whether valuables have been removed prior to the fire and whether the homeowner is in a precarious financial position. The Zaitchicks' moderate financial strength has been discussed already. In addition, Mr. Parish testified that all plaintiffs' valuables appeared to have been destroyed in the fire. In examining the premises on November 11, he found the remains of two television sets, a washer, a dryer, a refrigerator, a freezer, various tools by the garage, and other assorted goods. In short, even by the defendant's customary indicia of determining suspicion, Zaitchick was not a likely suspect.

In summary, the defendant has failed to prove by a preponderance of the credible evidence either that the Zaitchicks' fire resulted from arson or that the plaintiffs falsely exaggerated their insurance claims. The defendant, therefore, is liable to the plaintiffs under the contract. I will now turn to the remaining issue in this case: determination of the damages due and owing to the plaintiffs.

## II.

## DAMAGES

█ Plaintiffs assert that they should be awarded damages to cover the replacement of their house, commonly referred to as

replacement cost. Defendant, on the other hand, claims that it is liable only for the actual cash value of the house immediately before the fire. The defendant's argument is based on the insurance contract between the defendant and the plaintiffs. The contract permits recovery of replacement cost instead of actual cash value, but not "unless or until repair or replacement is completed." [9] "It is well settled," the defendant maintains, "that the actual repair or replacement of the damaged property is a condition precedent to recovery of replacement cost." Defendant's Post-Trial Memorandum at 2.

Plaintiffs, on the other hand, assert that various equitable axioms preclude defend-

ant's reliance on the contractual provisions. The Zaitchicks contend that the defendant's refusal to tender payment to them under the contract made replacement of their home and possessions financially impossible. Therefore, plaintiffs conclude, defendant "cannot profit from its own breach of the agreement", and is "estopped ... [since] the company prevent[ed] the insured from repairing or rebuilding by refusing payment ...." Plaintiffs' Oct. 14, 1982 Letter at 2. Plaintiffs forcefully argue that defendant's refusal to pay any money prevented them from rebuilding their home. They further suggest that it would be overly burdensome to shoulder the construction costs on a 66 year old school teacher without some fire insurance payments.[10]

---

**9.** Defendant's Exhibit M, "Additional Conditions," ¶ 1(d). The full text of the pertinent insurance contract provisions is as follows:

Additional Conditions

1. Replacement cost—Coverages A and B: This condition shall be applicable only to a building structure covered hereunder ....

b. If at the time of loss the whole amount of insurance applicable to said building structure for the peril causing the loss is less than 80% of the full replacement cost of such building structure, this Company's liability for loss under this policy shall not exceed the larger of the following amounts (1) or (2):

(1) the actual cash value of that part of the building structure damaged or destroyed; or

(2) that proportion of the full cost of repair or replacement without deduction for depreciation of that part of the building structure damaged or destroyed, which the whole amount of insurance applicable to said building structure for the peril causing the loss bears to 80% of the full replacement cost of such building structure.

c. This Company's liability for loss under this policy shall not exceed the smallest of the following amounts (1), (2), or (3):

\*    \*    \*    \*    \*    \*

(3) the amount actually and necessarily expended in repairing or replacing said building structure or any part thereof intended for the same occupancy and use.

d. When the full cost of repair or replacement is more than $1,000 or more than 5% of the whole amount of insurance applicable to said building structure for the peril causing the loss, this Company shall not be liable for any loss under paragraph a. or sub-paragraph (2) of paragraph b. of this condition unless and until actual repair or replacement is completed.

\*    \*    \*    \*    \*    \*

f. The Named Insured may elect to disregard this condition in making claim hereunder, but such election shall not prejudice the Named Insured's right to make further claim within 180 days after loss for any additional liability brought about by this policy condition.

\*    \*    \*    \*    \*    \*

Replacement Value Endorsement
Personal Property

In consideration of an additional premium, this Company agrees to substitute the term "replacement value" for "actual cash value" as it applies to the following:

1. Section 1—Coverage C—Unscheduled Personal Property

.    .    .    .    .

THE COMPANY'S LIABILITY FOR LOSS ON ANY PROPERTY INSURED UNDER THIS ENDORSEMENT SHALL NOT EXCEED THE SMALLEST OF THE FOLLOWING:

1. THE ACTUAL COST INCURRED TO REPAIR, RESTORE OR REPLACE,

\*    \*    \*    \*    \*    \*

THE COMPANY WILL NOT BE LIABLE FOR ANY LOSS UNDER THIS ENDORSEMENT UNLESS AND UNTIL ACTUAL REPAIR OR REPLACEMENT IS COMPLETED. THE NAMED INSURED MAY ELECT TO DISREGARD THIS ENDORSEMENT IN MAKING CLAIM UNDER THIS POLICY, BUT SUCH ELECTION SHALL NOT PREJUDICE THE NAMED INSURED'S RIGHT TO MAKE FURTHER CLAIM WITHIN 180 DAYS AFTER LOSS FOR ANY ADDITIONAL LIABILITY BROUGHT ABOUT BY THIS ENDORSEMENT.

Defendant's Exhibit M.

**10.** The trial did not reveal whether Mrs. Zaitchick was employed or not.

I find that both case law and equitable considerations render replacement cost the appropriate method of valuing plaintiffs' damages. The defendant does not challenge the plaintiffs' contention that a bank would be chary to lend money on the basis of an unlitigated law suit in which the defendant and its vast resources intend to present several defenses to payment. Nonetheless, defendant asserts, case law precludes plaintiffs' recovery of replacement value, citing *American Universal Ins. Co. v. Falzone,* 644 F.2d 65 (1st Cir.1981); *Kolls v. Aetna Cas. & Sur. Co.,* 503 F.2d 569 (8th Cir.1974); *Lerer Realty Corp. v. M.F.B. Mutual Ins. Co.,* 474 F.2d 410 (5th Cir.1973); *Bourazak v. North River Ins. Co.,* 379 F.2d 530 (7th Cir.1967); *Higgins v. Ins. Co. of North America,* 256 Or. 151, 469 P.2d 766 (1970).[11] These cited cases, however, are distinguishable from the instant case. In all the relevant cases cited by defendant save *Lerer Realty,* the defendant paid actual cash value, and was only litigating the issue of whether additional monies would be due under the relevant replacement cost contract provisos.[12] Thus, plaintiffs in the cited cases had at least some money with which to begin rebuilding their property.

The language of the Zaitchicks' insurance contract also supports my emphasis on whether cash value has been paid or not. The contract states that "[t]he Named Insured may elect to disregard this [replacement cost] condition in making claim hereunder, but such election shall not prejudice the Named Insured's right to make further claim within 180 days after loss for any additional liability [for replacement cost]." Defendant's Exhibit M, "Additional Conditions," ¶ 1(f). In other words, insureds can obtain the necessary funds to begin rebuilding their home, and subsequently upon completion of the construction, obtain additional amounts up to the replacement value. In the instant case, plaintiffs were refused any monies under the insurance contract. Not surprisingly, they were unable to replace their home. This conduct by defendant made it impossible for plaintiffs to fulfill the condition precedent, and therefore, excuses plaintiffs from performance of the replacement condition.

■ The last issue to be resolved is the precise dollar amount of damages due and owing to the Zaitchicks. Plaintiffs introduced evidence that it would cost $100,862 to rebuild their home. Defendant objects to this calculation because the original home was a modular home, a potentially less expensive house than the proposed reconstructed one offered into proof by plaintiffs. The defendant, however, did not establish that the original house owned by plaintiffs was less expensive. Modular homes are not always less expensive than ones built piece by piece. Trial Testimony of Mr. Obler. Plaintiffs' calculation is accepted.

The insurance contract provides that if the percentage of insurance coverage to replacement value is less than 80 percent, the defendant's liability is "that proportion of the full cost of repair ... which the whole amount of insurance applicable to said building ... bears to 80 percent of the full replacement cost of such building structure." Defendant's Exhibit M, "Additional Conditions," ¶ 1(b)(2). The percentage of insurance coverage to replacement value is 69.4 percent.[13] The defendant's liability, therefore, is limited by this provision to $87,500. Subtracting the $100 deductible leaves $87,400. Because this amount is greater than or equal to the maximum allocation under the insurance policy, defendant is liable for the entire $70,000 policy limit.

---

11. *American Universal,* however, is cited by defendant for the trial court's jury charge, and not the Circuit Court's holding. The jury upheld the arson defense in *American Universal,* so the issue of measuring damages was never reached.

12. By the terms of the insurance contract involved in *Lerer Realty, supra,* however, actual cash value was to be paid first on the insured's election, before the replacement cost question was to be reached. 474 F.2d at 412–13.

13. $70,000 is 69.4 percent of $100,862.

Similar reasoning leads to awarding $49,-000 to plaintiffs in replacement value for the destruction of their personal property. Plaintiffs introduced evidence that it sustained losses of over $52,000.[14] The policy provides for maximum payment of $49,000. Therefore, under the policy defendant is liable to the plaintiffs for $49,000.

In summary, defendant has failed to sustain its burden of proof in establishing either of its defenses of fraudulent exaggeration of claim or arson. Plaintiffs, on the other hand, have both established defendant's liability under the insurance contract, and their damages in the instant suit. Accordingly, plaintiffs are awarded $119,000 in damages. Settle judgment on five (5) days notice within ten (10) days of this order.

---

**14.** Plaintiffs filed for $52,696 in their Sworn Statement in Proof of Loss. They also claimed approximately $1,000 more at trial in unenumerated losses.