753 A.2d 1214 (2000)
332 N.J. Super. 515
Thomas W. WARD, Jr., Plaintiff-Appellant,
v.
MERRIMACK MUTUAL FIRE INSURANCE COMPANY, Barrett Insurance Agency, Inc., and George Barrett, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 2000.
Decided July 7, 2000.
*1215 Harry V. Osborne, II, Ocean, for plaintiff-appellant (Evans, Osborne & Kreizman, attorneys; Mr. Osborne, on the brief).
Fredric Paul Gallin, Westfield, for defendant-respondent (Methfessel & Werbel, attorneys; Mr. Gallin, on the brief).
Before Judges HAVEY, KEEFE and COLLESTER.
The opinion of the court was delivered by HAVEY, P.J.A.D.
This is an insurance coverage dispute concerning a first-party claim arising out of the destruction of plaintiff's structure by fire. Defendant Merrimack Mutual Fire Insurance Company (Merrimack) denied coverage, claiming that its authorized agent who issued a binder covering the structure had no actual or apparent authority to issue it. A jury ultimately determined that Merrimack was obligated to issue the policy and that it had breached that obligation.
Under its policy, Merrimack is obligated to pay the actual cash value of the insured's *1216 loss "until actual repair or replacement is completed." The trial court held that plaintiff is entitled only to the actual cash value of the loss, rather than the cost of replacement, because he did not repair or replace the structure before the County of Monmouth condemned the property fifteen months after the fire loss. We reverse and remand for a trial on the issue of damages. There are genuine issues of material facts concerning plaintiff's claim that Merrimack's wrongful breach of the insurance contract rendered impossible his ability to satisfy the condition precedent that he replace the structure before Merrimack is obligated to pay the cost of replacement.
On November 23, 1994, plaintiff, on behalf of himself and several business partners, purchased a three-story wood-frame building on Ocean Avenue in Long Branch. Thereafter, pursuant to a partnership agreement with his associates, plaintiff arranged for Robert Sickler to serve as "representative and agent in all dealing[s]" with respect to the property. Sickler applied for a fire insurance policy through defendant Barrett Insurance Agency, Inc., Merrimack's authorized agent. On April 21, 1995, George Barrett, on behalf of the Agency, issued a fire insurance binder covering the building through Merrimack, and Sickler paid Barrett $830, representing the full amount of the annual premium. The binder limited coverage to $329,000.
According to plaintiff, he and his associates expended approximately $150,000 in renovating the building. On May 2, 1995, the building was destroyed by fire. As of this time, no policy had been issued by Merrimack. Nevertheless, Barrett gave notice of the fire loss and pendency of plaintiff's claim for coverage to Merrimack. By letter dated May 10, 1995, Merrimack notified Barrett that it was "unable to accept [plaintiff's] application and [is] accepting no responsibility for any losses that have occurred here." The Merrimack representative explained:
This application requests that we accept coverage in an amount that exceeds our maximum for dwellings built in 1925. We have knowledge that the property is located approximately 300 feet from the ocean and, as you know, we are unable to accept coverage on property within 1,000 feet of the ocean. Although the application indicates that the property is occupied by one family, we believe that this may not be the case.
Both parties agree that had an insurance policy been issued by Merrimack it would have provided that:
When the cost to repair or replace the damage is more than $1000 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed.
You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis.
On June 6, 1995, plaintiff obtained an estimate to replace the structure which totaled $638,546.51. On July 30, 1996, Merrimack, despite denying coverage, invoked a provision under the exemplar policy calling for the appointment of appraisers to fix the actual cash value of plaintiff's loss. On September 20, 1996, over fifteen months after the fire, Monmouth County condemned plaintiff's property.
Plaintiff thereupon filed the present action against Merrimack, Barrett Insurance Agency, and George Barrett, seeking a declaration that Merrimack had insured the property through the Barrett Insurance Agency and that Merrimack breached the contract of insurance.[1] In an *1217 amended complaint, plaintiff asserted that Merrimack violated the Consumer Fraud Act, N.J.S.A. 56:8-1 to -97. Because the parties' appraisers could not agree on a figure as to actual cash value, an umpire was appointed by the trial court in accordance with the policy terms. On March 7, 1997, the umpire submitted an appraisal to the court fixing the cash value of the building prior to the fire at $164,600.[2]
During the liability trial, Merrimack claimed that there was no coverage because the binder issued by Barrett was "prepared after the fire, with forged signatures, [respecting] a piece of property [it] had already told the agent [it was] not going to write because it was outside of [its] underwriting guidelines." At the close of the trial, the jury returned a verdict in plaintiff's favor. An order for judgment on the issue of liability was thereupon entered stating that Merrimack "was obligated to provide a policy of insurance to the plaintiff, and that [Merrimack] breached that obligation." The court dismissed plaintiff's consumer fraud claim.
After oral argument on the issue of damages, the court entered an order on May 13, 1999, fixing the measure of loss at $164,600, the actual cash value of the building as determined by the umpire. The court included damages for lost rent and debris removal cost, and calculated prejudgment interest at eight percent. The court determined that plaintiff was entitled to the actual cash value of the building, as opposed to its replacement cost because, pursuant to the terms of the policy, the building was never rebuilt.

I
Plaintiff argues that he was entitled to the replacement cost, as opposed to actual cash value, because it was his intention from the outset to rebuild the structure, but that his ability to do so was frustrated by Merrimack's wrongful disclaimer of the binder issued by Barrett. In addressing that contention below, the trial court, citing Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993), held that the reasons for Merrimack's refusal to provide coverage were "fairly debatable." Thus, the court concluded, there was no basis to "vitiate" the condition precedent under the policy requiring plaintiff to repair or replace the structure before Merrimack was duty-bound to tender the replacement costs. The Court observed:
I am convinced that the measure of damages in this case is not the replacement value but the actual cash value, the 164,600. And I find that because I just think the replacement value is very difficult to calculate. It wasn't rebuilt at the time. It could be rebuilt, that is, after the appraiser came up with the amount for the actual cash value.
By that time, the demolition, the condemnation had already occurred.
In Pickett, the issue was whether an insured was entitled to consequential damages in excess of the policy terms as a result of its insurance carrier's bad faith in its review and processing of the insured's first-party claim under an existing policy of insurance. Id. at 466-67, 621 A.2d 445. It is distinguishable from the facts before us for two basic reasons. First, Pickett focuses on the conduct of the carrier in its review and processing of a claim under an existing policy, whereas here, Merrimack had taken the irrevocable position that no binding contract of insurance was ever issued by it.
Second, Pickett addresses the insured's right to compensatory damages in excess *1218 of the policy limits. Id. at 474-75, 621 A.2d 445. In defining "bad faith" justifying such consequential damages, the Court adopted the reasoning in Bibeault v. Hanover Ins. Co., 417 A.2d 313, 319 (R.I.1980), that if a claim by an insured "[i]s `fairly debatable' no liability in tort will arise." Pickett, supra, 131 N.J. at 473, 621 A.2d 445. In order "`[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the [carrier's] knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.'" Bibeault, supra, 417 A.2d at 319 (quoting Anderson v. Continental Ins. Co., 85 Wis.2d 675, 271 N.W.2d 368, 376 (1978)). Implicit in this standard is a finding of the carrier's "`reckless ... indifference to facts or to proofs submitted by the insured.' "Ibid. (quoting Anderson, supra, 271 N.W.2d at 376). Here, unlike the plaintiff in Pickett, plaintiff makes no claim for consequential damages beyond the policy limits for the carrier's "reckless indifference" to the facts or proofs submitted by him to the carrier. He seeks only to recover a benefit provided under the policy based on his contention that Merrimack's breach of contract prevented him from satisfying the precondition that he replace the structure before Merrimack is duty-bound to pay him.
A party to a contract may not avail itself of a condition precedent where by its own conduct it has rendered compliance therewith impossible. Creek Ranch, Inc. v. New Jersey Turnpike Auth., 75 N.J. 421, 432, 383 A.2d 110 (1978). This principle has been applied in the present context. See Bailey v. Farmers Union Co-operative Ins. Co. of Neb., 1 Neb.App. 408, 498 N.W.2d 591, 598 (1992) (where carrier's refusal to pay even the actual cash value of the structure, a condition precedent requiring replacement of the structure to recover replacement cost was waived under the rule that "[a] condition is excused if the occurrence of the condition is prevented by the party whose performance is dependent upon the condition"); see also generally Johnny Parker, Replacement Cost Coverage: A Legal Primer, 34 Wake Forest L.Rev. 295, 321 n. 201 (1999).
Applying this equitable rule, courts in other jurisdictions have held that an insurer is estopped from arguing that an insured cannot demand replacement costs under a policy provision requiring actual replacement of the damaged property as a precondition to recovery where the insurer's conduct frustrates the insured's ability to satisfy the precondition. See Zaitchick v. American Motorists Ins. Co., 554 F.Supp. 209, 217 (S.D.N.Y.1982), aff'd o.b., 742 F.2d 1441 (2d Cir.1983), cert. denied, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983); Maine Mut. Fire Ins. Co. v. Watson, 532 A.2d 686, 688 (Me.1987); Bailey, supra, 498 N.W.2d at 598-99; McCahill v. Commercial Union Ins. Co., 179 Mich.App. 761, 446 N.W.2d 579, 585 (1989); State Farm Fire & Cas. Ins. Co., 164 Ill.App.3d 874, 115 Ill.Dec. 832, 518 N.E.2d 357, 362 (1987), appeal denied, 119 Ill.2d 575, 119 Ill.Dec. 398, 522 N.E.2d 1257 (1988). See also Randy R. Koenders, Annotation, Construction and Effect of Property Insurance Provision Permitting Recovery of Replacement Cost of Property, 1 A.L.R. 5th 817, 855 (1992); Parker, supra, at 299 n. 15 and cases cited therein.
Although, in most cases the insured asserts equitable estoppel, see Zaitchick, supra, 554 F.Supp. at 216, the courts generally base their determination on the theory of impossibility, that is, that the carrier's conduct made it impossible for the insured to satisfy the precondition. For example, in the leading case of Zaitchick, the home of plaintiffs, an elderly couple, was destroyed by fire. Id. at 210. The defendant insurance carrier denied plaintiffs' claim because of evidence of arson and its assertion that plaintiffs had fraudulently exaggerated their claim. Id. at 212. The court found that defendant failed to sustain its burden of proof with regard to both the arson and fraud defenses. Id. at *1219 215. Because plaintiffs never replaced the structure, defendant argued that plaintiffs were only entitled to actual cash value based on the policy provision which permitted recovery for replacement cost but not "until actual repair or replacement is completed." Id. at 215-16. Accepting plaintiffs' argument that the defendant's refusal to pay any money, even the actual cash value of the loss, made it impossible for them to replace their structure, the court observed:
The defendant does not challenge the plaintiffs' contention that a bank would be chary to lend money on the basis of an unlitigated law suit in which the defendant and its vast resources intend to present several defenses to payment.

[Id. at 217.]
The court distinguished other cases in which the insurer had paid the insured actual cash value and litigated only the issue whether additional monies were due under the relevant replacement cost provision.
Citing Zaitchick, other courts as well have held that the replacement cost provision had been waived by the insurer because its conduct thwarted the insured's ability to satisfy it. See McCahill, supra, 446 N.W.2d at 585 ("[w]ithout the necessary funds being advanced by defendant, plaintiff would have little likelihood of being able to secure financing to repair or replace his property"); Pollock v. Fire Ins. Exch., 167 Mich.App. 415, 423 N.W.2d 234, 237 (1988) ("defendant's failure to pay on the claim hindered, and quite possibly even prevented plaintiff from complying with her obligation to repair or replace the building"). Cf. Maryland Cas. Co. v. Knight, 96 F.3d 1284, 1292 (9th Cir.1996) (rejecting theories of estoppel and impossibility of performance because insurance carrier had made payment of actual cash value "which payment could have immediately been applied toward the repair or replacement").
Notably, Zaitchick premised its holding on impossibility of performance, not whether or not the carrier had acted in bad faith in rejecting the insured's claim. Indeed, there was no finding of bad faith in Zaitchick. See also State Farm Fire & Cas. Ins. Co., supra, 115 Ill.Dec. 832, 518 N.E.2d at 362-63 (insurer's denial of liability to pay cost of vandalism because of insurer's belief a member of insured's family had committed the vandalism prevented insureds from complying with the replacement provision). The reasoning of the Zaitchick court fortifies our view that, in this case, bad faith or the enhanced standard articulated in Pickett is inapplicable.
Merrimack's breach of contract in refusing to acknowledge the issuance of a binding policy of insurance was, in our view, no less "wrongful" than the carrier's refusal to pay benefits in Zaitchick because of its suspicion of arson and the insureds' fraudulent exaggeration of their claim. As in Zaitchick, the focus is whether in fact Merrimack's refusal to tender even the actual cash value made it impossible for plaintiff to satisfy the precondition of replacing the structure. It is our view that genuine issues of material fact exist respecting this issue, requiring a trial on damages.
It is unclear from the abbreviated record before us,[3] whether Merrimack refused to tender the actual cash value of plaintiff's loss when that figure was ascertained by its adjuster. We do know that as of July 30, 1996, Merrimack was firm in its position that no binding policy existed, but nevertheless invoked the policy provision calling for the appointment by the parties of appraisers and, if necessary, an umpire, to fix the actual cash value of the loss. The umpire's determination was not made until March 7, 1997. By that time, the County had already condemned the property. During oral argument before the trial court, Merrimack's counsel *1220 stated that "this claim could have [then] settled if [plaintiff was] willing to work with the numbers that existed." If this means Merrimack had nevertheless expressed to plaintiff a willingness to tender in a timely fashion Merrimack's estimate of the actual cash value loss, without prejudice to plaintiff's continued pursuit of the cost of replacement, that fact may undercut plaintiff's impossibility of performance argument. However, based on what is before us, that question appears unsettled.
Even if it is determined that Merrimack under no circumstances would have advanced any monies to plaintiff,[4] the question is whether in fact that refusal was the cause of plaintiff not replacing the structure before the condemnation proceedings. Unlike the situation in Danzeisen v. Selective Ins. Co. of Am., 298 N.J.Super. 383, 385-86, 689 A.2d 798 (App.Div.1997), cited by the trial court, here there was no zoning impediment to plaintiff's replacement of the structure on the subject premises. The record supports plaintiff's contention that he was ready and able to obtain all necessary governmental permits to commence rebuilding. Further, plaintiff claims in his appellate brief that he "had taken the initial steps to replace the building by engaging a consultant to prepare a reconstruction estimate" at a cost of $3,000. Plaintiff's argument is that his intention to commence replacement, and the absence of any rezoning restriction is sufficient to establish that Merrimack's refusal to pay frustrated his ability to do so.
However, the insured's intention to repair or replace the damaged structure is not enough to trigger the carrier's obligation to pay. National Tea Co. v. Commerce & Indus. Ins. Co., 119 Ill.App.3d 195, 74 Ill.Dec. 704, 456 N.E.2d 206, 212 (1983); Hilley v. Allstate Ins. Co., 562 So.2d 184, 189 (Ala.1990); BSF, Inc. v. Cason, 175 Ga.App. 271, 333 S.E.2d 154, 157 (1985). To excuse the condition precedent, the facts must show that "the promisor [insurer] has caused the non-performance of the condition.... If the promisee [insured] could not or would not have performed the condition, or it would not have happened whatever had been the promisor's conduct, the condition is not excused." 5 Williston on Contracts § 677 (Jaeger ed.1961) (emphasis added). In Zaitchick, for example, the court found impossibility to perform the precondition because the insureds' advanced age and limited income, and the nature of the property made outside financing an unrealistic opportunity. 554 F.Supp. at 216-18. Compare Dickler v. CIGNA Property & Cas. Co., 957 F.2d 1088, 1096 (3d Cir.1992) (equities weighed against awarding replacement costs because, unlike the elderly couple in Zaitchick, the insureds were "sophisticated parties" and the loss occurred in the commercial setting).
It is undisputed that plaintiff and his business partners were entrepreneurs who purchased the subject property for investment purposes. Did plaintiff and his associates have sufficient resources to replace the structure without the insurance proceeds? Was it reasonably probable that they could have secured the necessary financing to rebuild, but for whatever reason chose not to pursue this option? Evidence of financial wherewithal or the ability to finance would obviously belie plaintiff's claim that Merrimack's refusal to provide coverage frustrated his plans to rebuild.
Moreover, plaintiff and his partners, being investors, may have intended to "sit" on the property without repairs or replacement with the expectation that it would be condemned by the County. Merrimack points out, for example, that it would have cost plaintiff, based on his own estimate, $638,546.51 to rebuild the structure. Merrimack's policy limit was $329,000. If Merrimack had tendered to plaintiff the *1221 actual cash value of $164,600, would plaintiff have expended $473,946.51 of his own money, knowing that, even if he prevailed on his claim for replacement costs Merrimack would be obligated only for the balance of $164,400 under its policy? These salient issues have not been addressed.
We remand for a trial on damages addressing plaintiff's contention of impossibility of performance in accordance with this opinion.

II
Plaintiff advances alternative arguments challenging the validity of the umpire's determination fixing the actual cash value loss at $164,600. He first argues that he was wrongfully deprived of a trial by jury on the damage issue when the trial court submitted the dispute between the parties' appraisers to the umpire.
As earlier noted, Merrimack invoked a provision in the policy, despite claiming that no policy existed, which provides for the appointment of appraisers by each party and, if there was a disagreement between them, to an umpire. The policy further provides that "[w]ritten agreement signed by any two of these three [the two appraisers and the umpire] shall set the amount of the loss." Merrimack's appraiser agreed with the umpire's figures. Plaintiff objected to the appraisal procedure at the outset. Upon Merrimack's motion, the trial court entered an order directing the parties to proceed with the appraisal process and that the actual cash value of the loss would be fixed in accordance with that procedure.
The appraisal procedure, a favored remedy, is consistent with the statutorily mandated provision allowing for appraisals upon disputes in value after a fire loss. See N.J.S.A. 17:36-5.20. The appraisal provision of the policy states that if either party disagrees on the amount of loss, either can demand "that the amount of the loss be set by appraisal." In that case each party "shall" select a compete independent appraiser, and if the appraisers fail to agree, they "shall" submit their differences to the umpire. The umpire's determination "shall set the amount of the loss." The fact that Merrimack had disputed coverage did not necessarily preclude either party from invoking the appraisal process. See Hala Cleaners, Inc. v. Sussex Mut. Ins. Co., 115 N.J.Super. 11, 12-13, 277 A.2d 897 (Ch.Div.1971).
Plaintiff also argues that because "the umpire refused to entertain any submissions from the parties, the conclusions he reached concerning the condition of the property prior to renovations was a matter of pure speculation, and had no factual basis whatsoever." Plaintiff notes that the umpire failed to obtain any input from the parties and made no contact with "anyone with actual knowledge of the building at the time of purchase in order to ascertain its condition or value." For example, plaintiff states that the Long Branch building inspector, Barrett, the insurance broker, and plaintiff himself, could have supplied relevant information to the umpire. Plaintiff argues that the umpire merely arrived at the actual cash value of the structure ($164,600) by dividing the insurance coverage cap ($329,000) in half without any factual basis to support his decision.
New Jersey employs the "broad evidence rule" under which the appraiser must consider "`every fact and circumstance which would logically tend to the formation of a correct estimate of the loss,'" so as to effectuate complete indemnity. Elberon Bathing Co., Inc. v. Ambassador Ins. Co., 77 N.J. 1, 11, 389 A.2d 439 (1978) (quoting McAnarney v. Newark Fire Ins. Co., 247 N.Y. 176, 159 N.E. 902, 905 (1928)). In Elberon, the Court held that because the appraiser for the insured failed to reveal, and the umpire failed to consider, cost and extent of repairs made, age of the building, depreciation, and use of the building prior to the fire, there was legal misconduct warranting the court to set aside the umpire's award. Id. at 15-16, *1222 389 A.2d 439. Here, unlike in Elberon, the umpire reviewed the appraisals for each party and met with the appraisers in an attempt to resolve the evaluation issue. There is nothing in the record indicating that plaintiff was not satisfied with the appraisal value reached by his own appraiser or the method he used in reaching the value. The umpire found neither appraiser's data with respect to comparable sales convincing. With respect to the extent and cost of renovations performed by plaintiff, the umpire spoke to Robert Sickler, plaintiff's agent, and a relative of the property owners and general contractor for the work performed on the building prior to the fire. Furthermore, he reviewed photographs and cost documentation that Sickler himself provided. These facts belie plaintiff's argument that the umpire failed to turn to any sources of information and "pulled" the appraisal amount "out of thin air."
We also reject plaintiff's argument that he was deprived of due process under the Fourteenth Amendment because the umpire declined to have the parties and their counsel participate in his fact-finding process. The trial court in fact found that the parties "did have input in terms of the submission of both their appraisals." Further, we have pointed out that an "[a]ppraisal is a proceeding without a presiding officer with authority to control proceedings and punish misconduct, without formal taking of evidence, without oaths, procedural safeguards, discipline or other court-like restraints." Binkewitz v. Allstate Ins. Co., 222 N.J.Super. 501, 511, 537 A.2d 723 (App.Div.) (holding that the appraisal procedure does not create sufficient safeguards against defamation to justify conferring absolute immunity on the participants), certif. denied, 113 N.J. 378, 550 A.2d 481 (1988). As such, the appraisal process does not lend itself to the formal introduction of evidence by the parties or the opportunity to submit rebuttal documents or proofs. Appraisers "act on their own skill and knowledge, need not be sworn and need hold no formal hearings so long as both sides are given an opportunity to state their positions." Elberon, supra, 77 N.J. at 17, 389 A.2d 439. Since the appraisal process fixed the actual cash value loss, no damage jury trial as to this issue need be conducted if it is determined on remand that plaintiff is not entitled to replacement-cost damages.

III
We have considered plaintiff's argument that the eight percent prejudgment interest awarded plaintiff on the actual cash value damage was an abuse of discretion because it "rejected the arguments that the equity markets, over the past four years represented the proper benchmark for measuring plaintiff's delay damages." We are entirely satisfied that the court's award was a sound exercise of its judicial discretion. Pressler, Current N.J. Court Rules, comment 9 on R. 4:42-11 (2000); Coastal Group, Inc. v. Dryvit Sys., Inc., 274 N.J.Super. 171, 181-82, 643 A.2d 649 (App.Div.1994).
Reversed and remanded for further proceedings.
NOTES
[1] No answer was filed on behalf of Barrett Insurance Agency or George Barrett individually. The claims against both defendants have been abandoned and they are no longer parties to this litigation.
[2] Prior to trial the court ruled that despite the fact that both parties requested a trial by jury, the matter would be tried by the court because "the claims presented are primarily equitable in nature." An order was entered after plaintiff's motion for leave to appeal, summarily reversing the trial court and directing there be a trial by jury. See Ward v. Merrimack Mut. Fire Ins. Co., 312 N.J.Super. 162, 711 A.2d 394 (App.Div.1998).
[3] The trial court entered an order pursuant to Rule 2:5-3(c) permitting plaintiff to exclude the trial transcripts from its submission as part of this appeal.
[4] Merrimack in fact loaned plaintiff $7,600 to remove debris from the property with the proviso that "[i]n the event Merrimack agrees that the loss in question is covered under its policy, then this loan shall be forgiven."