Filed 12/17/14 Unmodified opinion attached

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| STEPHENS & STEPHENS XII, LLC, | A135938; A136740 |
| Plaintiff and Appellant, | San Francisco County Super. Ct. Nos. CGC10502891 and CGC10502891 |
| v. | |
| FIREMAN'S FUND INSURANCE CO., et al., | |
| Defendants and Respondents. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

BY THE COURT:

The opinion filed November 24, 2014, is modified by deleting footnote 12 and replacing it with the following:

> We asked the parties for supplemental briefing on the propriety of a conditional judgment. In the supplemental briefing, both parties argue that such a judgment would be improper because Stephens XII recently sold the property. We disagree. Fireman's Fund's potential liability in the event of any such sale was not litigated below and, as a reviewing court, we must generally disregard matters occurring after the entry of the appealed judgment. (*Troung v. Nguyen* (2007) 156 Cal.App.4th 865, 882.) Nor would any such sale moot the issues before us as Fireman's Fund contends. Regardless of any sale, the validity of the JNOV and the form of judgment remain live issues between the parties, and entry of a conditional judgment in favor of Stephens XII may affect other relief available to the parties, such as costs.

The modification does not change the appellate judgment. (Cal Rules of Court, rule 8.264(c)(2).) Appellant's petition for rehearing is denied.

_____P.J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part DISCUSSION, A.2.B., C.

1

Trial Court:                    San Francisco County Superior Court

Trial Judge:                    Honorable Curtis E.A. Karnow

Counsel for Appellant:          Daniel Upham Smith; Valerie T. McGinty; Nina
                                Grigoryevna Shapirshteyn

Counsel for Amicus Curiae
United Policyholder on behalf
of Appellant:                   Sharon Joellen Arkin

Counsel for Respondent:         Rex S. Heinke; Reginald D. Steer; Ashley Brooke
                                Vinson; Teresa W. Ghali; Danielle Crockett

Filed 11/24/14 Unmodified opinion

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STEPHENS & STEPHENS XII, LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>FIREMAN'S FUND INSURANCE CO., et al.,<br><br>    Defendants and Respondents. | A135938; A136740<br><br>(City and County of San Francisco<br>Super. Ct. No. CGC-10-502891) |

Fireman's Fund Insurance Co. issued an insurance policy covering loss from property damage, including rent, on a building owned by plaintiff Stephens & Stephens XII, LLC (Stephens XII). Three days after the policy became effective, Stephens XII discovered the property had sustained serious damage from burglars who stripped it of all electrical and other conductive materials. Stephens XII sought reimbursement for the damage from Fireman's Fund, but Fireman's Fund delayed resolving the claim. Stephens XII then brought this suit.

The policy provided two different measures for reimbursing covered damages. Stephens XII could recover either the full cost of repairing the damages, so long the repairs were actually made, or the depreciated value of the damaged property. As of the date of trial, Stephens XII had not repaired the damage. The jury nevertheless awarded Stephens XII the full cost of repairing it. In addition, the jury awarded Stephens XII lost business income on a theory not authorized by the policy, but it declined to award lost rent, which was authorized by the policy. The trial court granted Fireman's Fund

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part DISCUSSION, A.2.B., C.

1

judgment notwithstanding the verdict (JNOV), finding that neither of the awards was permitted under the policy.

We reverse. Although we agree with the trial court that Stephens XII is not entitled to an immediate award for the costs of repairing the damage, we conclude that it is entitled to a conditional judgment awarding these costs if the repairs are actually made. We also uphold the award for lost business income because it is properly construed as an award for compensable lost rent. Finally, we conclude that there are insufficient grounds to proceed with a new trial.

## BACKGROUND

Stephens XII filed this suit against Fireman's Fund, American Insurance Company, and Factory Mutual Insurance Company,[1] alleging causes of action for breach of contract and breach of the covenant of good faith and fair dealing. The operative complaint alleged that Stephens XII purchased a liability insurance policy from Fireman's Fund for a commercial property in January 2007. Property-damage coverage was later added and became effective on June 28. On July 1, Stephens XII discovered that burglars had caused more than $2 million in damage to the property. Stephens XII notified Fireman's Fund of the property damage, but the insurance company failed to pay for it.

A. Fireman's Fund's Liability.

Fireman's Fund was found liable to Stephens XII on both causes of action after a jury trial. The factual findings underlying its liability are not challenged in this appeal, but we review them briefly to provide context for the appellate claims.

Stephens XII is a limited liability company formed for the purpose of buying and operating the property, a very large industrial warehouse located in Richmond, California. Stephens XII, in turn, is managed by D.R. Stephens & Company, a "property

---

[1] Stephens XII's claims against Factory Mutual were settled and are not involved in this appeal. American is a Fireman's Fund subsidiary, and we will refer to them jointly as "Fireman's Fund" because any distinction between them is immaterial for purposes of this appeal.

management company" that manages some 40 real properties.[2]  When Stephens XII purchased the property in 2005, it was being used as a distribution center by a tenant, Navistar International Transportation Corporation (Navistar).

In January 2007, Stephens & Company, Stephens XII, and more than 30 other, presumably related, entities became insured under a Fireman's Fund commercial insurance policy.  Stephens XII, however, did not arrange for property-damage coverage on the property because Navistar already carried it.  After Navistar vacated the property on May 31, 2007, Stephens XII realized it needed property-damage coverage and, through its insurance broker, contacted Fireman's Fund to secure it.  The coverage was added, and it became effective on June 28.

The property was burglarized sometime after June 8, when the property was inspected and found sound.  Burglary hardly begins to describe the nature of the crime.  Virtually all conductive material was stripped from the building and taken away.  An electrician who examined the damage said "[t]he copper theft was the most complete job I've ever seen."  There was water damage throughout; walls were damaged; fire-protection equipment was rendered inoperable; and virtually all electrical components had been taken away.  The estimated cost of repair exceeded $1 million.  The theft appears to have stopped on or about July 1, after a police officer on routine patrol spotted a door ajar, investigated, and detained two men who said they were collecting metal inside the building.

Within days of discovering the damage, Stephens notified Fireman's Fund.  Although Fireman's Fund eventually paid Stephens XII for emergency repairs, it neither accepted nor denied coverage for the loss.  From virtually the beginning of its investigation, Fireman's Fund was concerned that the damage was too extensive to have

---

[2] The precise legal relationship between Stephens XII and Stephens & Co. is not clear from the testimony at trial.  It appears that Stephens & Co. organized the purchase of the property by a group of investors, who presumably became the members of Stephens XII, the entity owning the property.  Donald Stephens, the founder of Stephens & Co., was among the investors in Stephens XII and was involved in management decisions concerning the property.

occurred in the brief period of the policy's coverage. Fireman's Fund ultimately denied coverage, but not until February 2012—nearly five years after the incident and barely a month before trial—on grounds that Stephens XII had concealed and misrepresented material information during the insurance investigation.

Trial began the next month. In a special verdict, the jury concluded all of the damage occurred while the policy was in effect, rejected Fireman's Fund's defenses of concealment and misrepresentation, and found for Stephens XII on its claims for breach of contract and breach of the covenant of good faith and fair dealing.

B. The Damages.

The issues raised on appeal all relate to the jury's award of damages. Under the breach of contract claim, the jury awarded $2,100,293 for the "Replacement Cost" of the damage to the property and $2,135,936 in lost "Business Income." Under the claim for breach of the covenant of good faith and fair dealing, the jury denied damages for costs of repair and lost profits, but it awarded $436,896 in what was characterized as "lost rents." As we will describe further below, the trial court concluded that the terms of the policy did not support the jury's awards, and it entered JNOV for Fireman's Fund.

1. Replacement or Repair Cost.

Under the heading "**Valuation**," the policy provides two alternative means for determining the amount Fireman's Fund is required to pay for property damage. Fireman's Fund must initially value the damages according to their "Replacement Cost," meaning the expenditure required to replace the damaged property with "new property of comparable material and quality." Significantly, however, Fireman's Fund is not required to pay replacement cost "until the lost or damaged property is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." We shall refer to this provision requiring the repairs to be made before full replacement cost is to be paid as the policy's repair requirement. When Fireman's Fund's obligation to pay full replacement cost is triggered, Fireman's Fund is

4

only required to pay "[t]he amount [the insured] actually spend[s] that is necessary to repair or replace the lost or damaged property." [3]

---

[3] The full text of the relevant section of the policy is as follows:

"**K.    Valuation**

"1.    Replacement Cost
"If a loss occurs:
"a.    We will determine the **value** of the lost or damaged property at Replacement Cost as of the time of the loss or damage, except as provided below.  Replacement cost means the cost to replace with new property of comparable material and quality and used for the same purpose without deduction for depreciation.
"b.    You may make a claim for loss or damage covered by this insurance on an Actual Cash Value basis instead of a Replacement Cost Basis. In the event you elect to have loss or damage settled on an Actual Cash Value basis, you may still make a claim for the additional coverage which Replacement Cost provides if you notify us of your intent to do so within 180 days after the loss or damage.
"c.    We will not pay on a Replacement Cost basis for any loss or damage until the lost or damaged property is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.
"d.    We will not pay more for loss or damage on a Replacement Cost basis, including loss caused by the enforcement of an ordinance or law, than the least of the following:
"(1)    The Limit of Insurance applicable to the lost or damaged property;
"(2)    The cost to replace the lost or damaged property with other new property of comparable material and quality and used for the same purpose; or
"(3)    The amount you actually spend that is necessary to repair or replace the lost or damaged property.
"e.    You may voluntarily elect to rebuild on another site provided it does not increase the amount of loss or damage which we would otherwise pay to rebuild at your current site.  But we will not pay for the cost of the land."

As an alternative to seeking replacement cost, the insured may claim "Actual Cash Value," which is defined as the actual, depreciated value of the damaged property.[4] As the policy acknowledges, the actual cash value might be "significantly less" than the replacement value. If an insured makes a claim for actual cash value, it may still repair the damage and claim the additional amount necessary to equal the replacement cost, so long as the insured notifies Fireman's Fund of its "intent to [make a claim for the additional costs] within 180 days after the loss or damage."

These provisions are apparently common in property-damage insurance policies. They were explained succinctly in *D&S Realty v. Markel Ins. Co.* (2012) 284 Neb. 1 [816 N.W.2d 1] (*D&S Realty*), and we quote at length from that decision. "Standard casualty protection for residential and commercial property insures the property only to the extent of its actual cash value. Actual cash value is the value of the property in its depreciated condition. The purpose of actual cash value coverage is indemnification. It is to make the insured whole, but never to benefit the insured because the loss occurred.

"Most standard indemnity policies allow the insurer to choose to pay the lesser of actual cash value or the cost of repairing or replacing the damaged property. Thus, where the cost to repair or replace is greater than the actual cash value, the insured, not the insurer, is responsible for the cash difference necessary to replace the old property with new property.

"Replacement cost insurance is optional additional coverage that may be purchased to insure against the hazard that the improvements will cost more than the actual cash value and that the insured cannot afford to pay the difference. In essence, replacement cost coverage insures against the expected depreciation of the property. Unlike standard indemnity, replacement cost coverage places the insured in a better position than he or she was in before the loss. 'Any purported windfall to an insured who purchases replacement cost insurance is precisely what the insured contracted to receive

---

[4] An endorsement to the policy defines actual cash value as "the amount it would cost to repair or replace Covered Property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence."

6

in the event of a loss.'  Replacement cost coverage is, accordingly, more expensive than standard indemnification coverage.

"But because replacement cost coverage places the insured in a better position than before the loss, there is a moral hazard that the insured will intentionally destroy the insured property in order to gain from the loss.  For this reason, most replacement cost policies require actual repair or replacement of the damaged property as a condition precedent to recovery under the replacement cost rider.  The repair/replace condition generally requires . . . that the repair or replacement occur 'as soon as reasonably possible after the loss,' or a similar time constraint.

"If the insured has contracted for replacement cost coverage, the insured will normally be entitled under the policy to an immediate payment representing the actual cash value of the loss, which can be used as seed money to start the repairs.  Depending on the policy, the acceptance of this actual-cash-value payment may trigger a more limited time constraint for completion of the repairs. . . .  If the insured repairs or replaces the property within the time period stated in the policy, the insured will then be entitled to an additional payment for the amount by which the cost of the repair or replacement exceeded the actual cash value payment."  (*D&S Realty, supra*, 816 N.W.2d at pp. 14-16, fns. omitted.)

According to a company adjuster who testified at the trial here, Fireman's Fund handles property-damage claims consistent with the process described in *D&S Realty, supra*, 816 N.W.2d 1.  "On a typical basis, the way the losses are handled is that you would . . . reach an agreed scope and cost of repairs, and from that amount you would basically take away what's called depreciation. . . .  And [Fireman's Fund] would issue the actual cash value . . . payment up front.  From the time that that payment is issued, the insured has 180 days to basically show that they have completed or near completion of the actual repairs, and then they can come back and receive up to the amount of held back depreciation."

That is not what happened here.  During the three years between the burglary and the initiation of this lawsuit, the parties engaged in an extended series of ultimately

7

fruitless discussions about reimbursement for the damage. During the course of the discussions, it appears never to have been suggested by either party that Stephens XII seek an actual cost value payment, thereby providing it the "seed money" to start repairs. (*D&S Realty, supra,* 816 N.W.2d at p. 16.) As a Stephens XII witness involved in the negotiations acknowledged, Stephens XII sought the replacement cost of the damage, even though it had taken no steps to make the repairs. Fireman's Fund, in turn, never accepted coverage for the loss. At the time of trial, few repairs had been made, beyond the emergency ones for which Stephens XII had been reimbursed by Fireman's Fund.

At trial, Stephens XII presented no evidence of the actual cash value of the damaged property and expressly disclaimed any intent to seek recovery under this measure.[5] As a result, no provision was made for actual cost value damages in the special verdict form. Rather, Stephens XII sought exclusively replacement cost damages, taking the position that it was excused from complying with the repair requirement as a result of Fireman's Fund's denial of coverage.

In the special verdict, the jury found that Fireman's Fund "fail[ed] to make payments required by the policy, which prevented Stephens [XII] from repairing the damage to the Property." Although it found that Stephens XII had not repaired the property, it also determined that Stephens XII had performed its material duties under the policy. The jury valued the replacement cost at $2,100,293.

Fireman's Fund moved for JNOV, contending Stephens XII was not entitled to replacement cost as a matter of law because Stephens XII had not satisfied the precondition of the repair requirement. Stephens XII argued that the jury had concluded Fireman's Fund's failure to pay the actual cost value prevented and excused Stephens XII from the repair requirement.

---

[5] During the jury instructions conference, the trial court confirmed with Stephens XII's counsel, "it's my understanding that the plaintiff's right now firmly on the record without any equivocation that they are not asking for actual cash value in this case." Counsel responded, "No, we are not asking for actual cash value."

The trial court granted the motion. It found that Stephens XII was required to complete the repairs before it was entitled to receive replacement cost. It also found that Stephens XII's claim that it was excused from the repair requirement was unsupported by the language of the policy. As the court reasoned, Stephens XII was permitted to claim either actual cost value or replacement value, and Fireman's Fund's obligation to pay did not arise until a claim was made. The court held that although Stephens XII "plainly sought insurance proceeds from [Fireman's Fund]," it never made a claim for actual cost value prior to trial and disclaimed the recovery of actual cost value at trial. The court declined to find that the payment of actual cost value was a condition precedent to Stephens XII's obligation to repair in order to receive replacement cost, noting the right to replacement cost is independent of the right to actual cost value under the policy, and the "availability of these independent avenues to compensation counters the interpretation that proceeding down one of those avenues is a condition to the steps involved in prosecuting the other avenue."

2. Lost Business Income.

An endorsement to the policy provided, "[Fireman's Fund] will pay for the actual loss of **Business Income and Rental Value** which you sustain due to the necessary suspension of **operations** during the **period of restoration**. The suspension must be caused by direct physical loss or damage at the **premises**, . . . caused by or resulting from a **covered cause of loss**." For purposes of the provision, "**Operations**" was defined as "your business activities occurring at the described premises and the tenantability of the described premises." "**Rental Value**" was defined as "[t]he total anticipated rental income from tenant occupancy of the premises . . . as furnished and equipped by you."

Stephens XII provided evidence of two types of damages under this provision and asked the jury to award one or the other, but not both. First, Stephens XII sought, as lost business income, lost profits from a deal to sell the property in March 2008 that fell through. An expert witness for Stephens XII testified that the damages associated with this failed real property sale amounted to over $10 million. Alternatively, Stephens XII sought the equivalent of nearly five years' rent for the property, which had remained

9

vacant between the time of the burglary and the trial. The damages expert assumed the property would have been rented on a "triple net" basis at a rental value of $.30 per square foot per month, beginning December 1, 2007.[6] Based on 242,720 square feet, the total lost rent to the time of trial was $3,589,110. During cross-examination, the expert acknowledged that the rent proposal on which he based his estimate actually provided for monthly rent of $.20 per square foot when calculated on a triple net basis. Although the expert assumed that the property could have been repaired and rented within six months, Stephens XII's attorney suggested to the jury that it would be "reasonable" for it to find that it would have taken a full year to rent the property, given the time needed for repair and marketing.

The special verdict form included a series of questions relating to both lost business income and lost rent. The jury found that Stephens XII had suffered lost business income under the policy and awarded $2,135,936. In a section of the special verdict form labeled, "COVERED LOSS OF RENTAL VALUE," the jury appears initially to have found that Stephens XII suffered "an actual loss of 'Rental Value' " but scratched out its "yes" response to this finding and changed it to "no." It accordingly awarded no damages for loss of rental value under the breach of contract claim. The jury also awarded bad faith damages of $436,896, which it inserted in a blank labeled "lost rents."

In its JNOV motion, Fireman's Fund argued that income lost from the failed real estate sale did not constitute lost "business income" under the policy as a matter of law. Stephens XII countered by arguing that the award of business income should be interpreted as lost rents. It pointed out that the $2,135,936 awarded by the jury was exactly equal to 44 months of rent, calculated on the basis of $.20 per square foot. An award of 44 months of rent would assume the property was rented from July 2008, one year after the damage occurred, as urged by Stephens XII's attorney, through March

---

[6] Under a triple net lease, a common commercial arrangement, "the renter pays all operating expenses and the owner gets a net check."

10

2012, the month of trial.  Stephens XII suggested that the jury viewed the lost rents to be lost business income because the company was in the business of renting property, and two company employees had equated lost rents and lost business income during their testimony.

In granting JNOV, the trial court concluded Stephens XII could not have suffered lost business income because it did not conduct any business at the property, as required by the policy.  The court found the verdict to be "unambiguous" in not awarding lost rents, and it rejected Stephens XII's theory that the jury conflated business income and lost rents.  In addition, the court overturned the jury's award of bad faith damages because no compensatory damages had been properly awarded.

C.  The New Trial Motion.

When it filed its motion for JNOV, Fireman's Fund also filed a motion for a new trial, arguing not only that the jury's award of damages was erroneous as a matter of law but also that its factual findings were against the weight of the evidence.  The trial court initially denied the motion as moot in light of its grant of JNOV.  At the request of Fireman's Fund, the court reconsidered and granted a new trial in a subsequent order ruling, "The motion for a new trial is granted, to be effective only if my ruling on the motion JNOV is vacated or reversed [on appeal].  [Citation.]  Specifically, for the reasons stated in my [written decision granting JNOV], I find that there was an insufficiency of the evidence to support the award of damages, that the decision was against the law, and the verdict was against the weight of the evidence."

At oral argument on Stephens XII's postverdict motion to amend the complaint, Stephens XII's counsel sought clarification of the scope of the court's order on the motion for a new trial.  Counsel noted that the court's reasons for granting the motion "deal with the complaint only, and not cross-complaint, and I just want to make sure that the new trial is granted only with respect to those issues."[7]  The court responded, "when I

---

[7] The existence of a cross-complaint is news to this court, since neither party included such a document in its appendix.  It is unclear what claims were alleged in the cross-complaint, although Stephens XII's counsel spoke of a "qui tam action."

say we're going to have a new trial, we would have to . . . give Fireman's Fund the opportunity to again try to have a new trial on all of those legal and factual issues [of the cross-complaint]. . . . So we would, in fact, be retrying all of those issues. We would just start from the top." In a written order, entered the same day, the court reaffirmed this ruling, noting, "if there is to be a new trial then, depending on the direction from the Court of Appeal, all the issues including all affirmative defenses would be retried."

Finally, in September 2012, the trial court entered an order amending the judgment nunc pro tunc to award certain costs of suit to Fireman's Fund and denying costs to Stephens XII.

Stephens XII initially appealed the trial court's orders granting JNOV and a new trial, and the judgment entered on those orders. It later filed a second notice of appeal addressed to the court's amendment of the judgment to award costs. The appeals were consolidated by our order of May 21, 2013.

DISCUSSION

A. The JNOV on the Breach of Contract Cause Cannot Be Sustained.

" ' "The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. [Citation.] The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.] On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citation.]" ' " (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1237.) Where, however, the trial court's grant of JNOV is based on an issue of law—here, the interpretation of an insurance policy—our review is de novo. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138; *Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exchange* (2014) 212 Cal.App.4th 69, 73 [interpretation of insurance policy is an issue of law].)

12

We conclude that the trial court's grant of JNOV cannot be sustained under these standards. As we shall explain, although Stephens XII is not entitled to an immediate award for the costs of repairing the damage, it is entitled to a conditional judgment awarding these costs if the repairs are actually made. And, as we shall further explain, the jury's award for lost business income is properly construed as an award for lost rent.

1. Stephens XII Is Entitled to a Conditional Judgment Awarding It Replacement Cost if It Repairs the Damaged Property.

The trial court properly interpreted the policy's terms, and Stephens XII does not seriously contend otherwise. Under these terms, Stephens XII could claim either actual cost value or replacement cost, but it was entitled to receive replacement cost only if it actually repaired the damage. As the court observed in granting JNOV, there was no dispute that Stephens XII did not repair the property and was ineligible to receive replacement cost under the literal terms of the policy. While the parties dispute whether the court properly interpreted the policy as requiring an affirmative claim for actual cost value reimbursement, Stephens XII disclaimed any intent to recover actual cost value at trial and presented no evidence of this measure of damages.

Instead of arguing that the trial court misinterpreted the policy's terms, Stephens XII instead argues that it was excused from complying with the repair requirement under various doctrines. We therefore turn to consider these arguments.

a. Prevention.

Stephens XII first argues that it was excused from complying with the repair requirement because it was prevented from repairing the damage by Fireman's Fund's failure to accept coverage. As the doctrine of prevention was articulated in *Jacobs v. Tenneco West, Inc.* (1986) 186 Cal.App.3d 1413, 1417, " 'Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.' [Citation.]" quoting the Restatement (Second) of Contracts, section 245. " 'Although it is implicit in the rule that the condition has not occurred, it is not necessary to show that it would have occurred but for the lack of cooperation. It is only required that the breach have contributed materially to the non-

13

occurrence. Nevertheless, if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply.' " (*Ibid.*) More recently, *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455 (*City of Hollister*) reached a similar result through application of the doctrine of estoppel. (*Id.* at pp. 491-492.)

No reported California case has addressed the application of the prevention doctrine in the context of the type of repair requirement at issue here, but several decisions from other jurisdictions have. Courts have largely, but not uniformly, excused the insured from repairing damaged property when the insurer failed to pay on the claim or hindered or prevented the repair. (See *Pollock v. Fire Ins. Exchange* (1988) 167 Mich. App. 415 [423 N.W.2d 234, 236-237], *Bailey v. Farmers Union Co-op. Ins. Co.* (Neb.App. 1992) 498 N.W.2d 591, 598-599, *Ward v. Merrimack Mut. Fire Ins. Co.* (2000) 332 N.J. Super. 515 [753 A.2d 1214, 1219-1221], and *Rockford Mut. Ins. Co. v. Pirtle* (Ind.App. 2009) 911 N.E.2d 60, 66-67.)[8] On the other hand, Florida courts have not excused the insured from repairing damaged property under similar circumstances.[9]

Two decisions, *D&S Realty, supra*, 816 N.W.2d at pages 16-17 and *Smith v. Michigan Basic Property Ins. Assn.* (1992) [441 Mich. 181] 490 N.W.2d 864, 868 (*Smith*), found a middle ground. Both concluded that an insurer's failure to pay on a claim or other hindrance excused the policy's *procedural* requirements, such as time restrictions, but did not entirely excuse the insured from its underlying obligation to repair the property. They held that the insured was entitled to a judgment requiring the insurer to pay actual cost value immediately and to pay replacement costs conditionally on the insured's completion of repairs promptly from the date of the judgment. (*Smith*, at

---

[8] In addition, *Conrad Brothers v. John Deere Ins. Co.* (Iowa 2001) 640 N.W.2d 231 (*Conrad Brothers*) discussed prevention doctrine but ultimately reached the same result under the doctrine of repudiation. (*Id.* at p. 242.)

[9] We mention cases cited by the parties. Additional cases are discussed in *Conrad Brothers, supra,* 640 N.W.2d at page 240, and *Ward, supra*, 753 A.2d at page 1218.

14

p. 866.) In effect, the courts granted specific performance of the insurance policy, requiring the insurer to make good on its contractual obligation to pay full replacement cost only upon the insured's satisfaction of the condition precedent of repairing the property.

The rationale for this approach was explained in *D&S Realty*, partly by referring to the decision in *Smith, supra*, 490 N.W.2d 1: "In [*Smith*]*,* the Michigan Supreme Court held that the excusal of the insureds' performance of the repair/replace condition was only temporary. [¶] . . . [¶] The insurer in *Smith* had, in good faith, denied the insureds' claim after fire destroyed their home, believing that the insureds deliberately set the fire. When it appeared that the home would not be repaired, the city demolished what was left of the structure, and the insureds had not replaced it. . . . [¶] The . . . Supreme Court [pointed out] that [in such a situation] ' "a bank would be chary to lend money on the basis of an unlitigated law suit in which the defendant and its vast resources intend to present several defenses to payment." ' Thus, the insureds 'could not be expected to repair, rebuild, or replace while this litigation was pending." However, once litigation has determined the insureds are entitled to coverage, the insurer's defense to coverage 'no longer stands in the way of lender-assisted financing of repair, rebuilding, or replacement.' [¶] Although the insured's house in *Smith* had been demolished by the time the policy dispute was decided, the policy allowed the insured to rebuild in a different location from the site of the loss. Accordingly, the Michigan Supreme Court concluded that the insureds' 'interest in obtaining payment of replacement cost can be protected without estopping the insurer from requiring actual repair, rebuilding, or replacement.' The court remanded with directions that the judgment award the insureds actual cash value and require an additional payment by the insurer when and if the insureds actually repaired, rebuilt, or replaced their home. [¶] . . . [¶] There are courts which hold that the good faith denial of liability under the policy absolutely and permanently excuses or waives the insured's obligation to perform the repair/replace condition. But we agree with the reasoning in *Smith*. The respective interests of parties acting in good faith can, in most cases, be adequately protected by excusing the

15

performance of the repair/replace condition only for such time as it appears the insurer will not honor its obligations under the policy. Where the insured can still conduct the repairs/replacements and be reimbursed by the insurer, then the good faith denial of liability should not operate to give the insured a benefit it did not contract for." (*D&S Realty, supra*, 816 N.W.2d at pp. 16-18, fns. omitted.)

We are persuaded by this reasoning and adopt it. When an insurer's decision to decline coverage materially hinders an insured from repairing damaged property, procedural obstacles to obtaining the replacement-cost value should be excused. If coverage is ultimately resolved in favor of the insured, the insured should remain eligible to receive replacement cost, but only so long as the insured complies with other applicable policy terms, such as a repair requirement. In other words, a coverage dispute should not give the insured a benefit under the policy it never had in the absence of the dispute—such as the right to receive replacement cost without actually repairing the damage.[10]

Here, Fireman's Fund's delayed resolution and denial of the claim materially hindered Stephens XII's ability to plan for the property. As a result, Stephens XII should be excused from the requirement that the damage be repaired "as soon as reasonably possible after the loss or damage." Had Stephens XII sought damages based on actual cost value and proved them at trial, it would have been entitled to an immediate award of such damages. When Stephens expressly disclaimed recovery of actual cost value damages, it waived an award based on this measure. In any event, such an award would lack an evidentiary basis because no evidence of actual cost value damages was presented

---

[10] We recognize that both *D&S Realty, supra,* 816 N.W.2d 1 and *Smith, supra,* 490 N.W. 2d 864 limited their holdings to coverage disputes conducted in good faith, while Fireman's Fund was found to have acted in bad faith. The finding of bad faith subjected Fireman's Fund to tort remedies, including punitive damages (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1073), but Stephens XII has provided us with no California authority for depriving an insurance company of its contractual rights under the policy because it failed promptly to pay a property-damage claim in an amount calculated under a measure disclaimed by the insured.

at trial.[11] Stephens XII nonetheless remains entitled to a judgment awarding replacement cost consistent with the repair requirement if it actually completes the repairs "as soon as reasonably possible" after the judgment becomes final.[12]

Fireman's Fund argues that Stephens XII is not entitled to an award of replacement cost because completion of the repairs is a condition precedent to the right to receive them.[13] We are persuaded our decision properly addresses this concern. Stephens XII's failure to satisfy the condition precedent precluded its immediate recovery of replacement cost, but it does not follow that the failure deprived Stephens XII of the right to litigate about replacement cost—that is, to prove its entitlement to reimbursement of replacement cost conditioned upon satisfaction of the condition precedent.

---

[11] In this connection, Stephens XII contends the trial court erred in denying its oral request, made during argument on Fireman's Fund's motion for a directed verdict, to reopen the evidence to permit proof of actual cost value. We find no abuse of discretion by the trial court in denying the request. (See *Estate of Young* (2008) 160 Cal.App.4th 62, 91 [trial courts have broad discretion in ruling on motion to reopen].) Stephens XII presumably knew that proof of actual cost value would be required if the company expected to recover it. The failure to submit such proof appears to have been a tactical decision, rather than an oversight. In any event, Stephens XII subsequently waived any recovery of actual cost value when its attorney unequivocally informed the court, "No, we are not asking for actual cash value."

[12] We asked the parties for supplemental briefing on the propriety of a conditional judgment. In this supplemental briefing, both parties argue that such a judgment would be improper because Stephens XII recently sold the property. We do not agree. Even if cognizable evidence of a sale were before us, which it is not, we would find it to be immaterial. The policy's repair requirement is not extinguished simply because Stephens XII may have rendered itself unable to satisfy it (and thereby ineligible to recover replacement cost) by selling the property. Nor would a sale moot the issue as Fireman's Fund contends. Regardless of any sale, the validity of the JNOV and the form of judgment remain live issues between the parties, and entry of a conditional judgment in favor of Stephens XII may affect other relief available to the parties, such as costs. Accordingly, we deny Fireman's Fund's request for judicial notice of documentation relating to the sale, filed September 8, 2014.

[13] " '[A] "condition precedent" is "either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." ' " (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1009.)

17

We recognize that "[g]enerally, a party's failure to perform a condition precedent will preclude an action for breach of contract." (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1192.) But here, Stephens XII's repair of the property is not a condition precedent to Fireman's Fund's liability under the policy. Instead, Fireman's Fund's duty to reimburse Stephens XII arose as soon as a claim was filed. At that point, Fireman's Fund was liable to pay actual cost value. Repairing the damaged property was a condition precedent only for the additional obligation to pay the difference between actual cost value and replacement cost.

Fireman's Fund argues that Stephens XII failed to prove the coverage dispute hindered or prevented it from repairing the property. The jury found otherwise, and that finding was supported by substantial evidence. While there was significant evidence that Stephens XII had debated whether to repair, subdivide, or demolish the property, there was also significant evidence that Fireman's Fund's refusal to commit to coverage made it difficult for Stephens XII to know what to do with the property. Donald Stephens testified that the company had essentially exhausted its capital in maintaining the property and needed a coverage commitment from Fireman's Fund to proceed. We are satisfied that the uncertainty created by Fireman's Fund's failure to accept coverage sufficiently hindered Stephens XII's ability to repair the property to satisfy the prevention doctrine.[14]

The judgment must accommodate an additional limitation on Stephens XII's ability to recover replacement cost. Stephens XII submitted proof of *likely* replacement cost and received a monetary award of those costs from the jury. The policy, however, limits Fireman's Fund's obligation to "[t]he amount [the insured] *actually spend*[*s*] that is necessary to repair or replace the lost or damaged property." (Italics added.) Just as we

---

[14] We also find no basis for Fireman's Fund's claim that Stephens XII waived its argument by not presenting evidence or seeking appropriate jury instructions. The general issue of Stephens XII's entitlement to replacement cost had been an issue throughout the litigation, both sides presented evidence and examined witnesses with the issue in mind, and a special verdict question related to the issue.

find no basis for excusing Stephens XII's obligation to repair, we find no basis for awarding Stephens XII a specific amount of replacement cost before it makes the actual repairs.  Instead, Stephens XII is entitled to a judgment declaring its right to receive reimbursement for repair costs, if and when the repairs have actually been performed in a timely manner, and in an amount equal to Stephens XII's actual expenditures for them.

### b.    Waiver.

Stephens XII also argues that Fireman's Fund waived its right to insist on compliance with the repair requirement because it failed to "assert" such an insistence in various communications with Stephens XII.  We are not persuaded.  In the insurance context, "[c]ase law is clear that ' "[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.]  The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' [Citations.]  The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.  [¶] . . . California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31)  "Whether a waiver has occurred depends solely on the intention of the waiving party.  [Citation.]  An intention to waive a limitations provision is not evinced by the failure to raise that point in a letter denying a claim." (*Velasquez v. Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 722.)

Here, there is no evidence, much less evidence that is clear and convincing, that Fireman's Fund intentionally relinquished its right to insist on compliance with the repair requirement.  Stephens XII cites no express waiver by Fireman's Fund, and the various instances of omission cited by Stephens XII do not establish an intentional relinquishment of rights.  Stephens XII points out, for example, that Fireman's Fund did not calculate and pay the claim on the basis of actual cost value, as required by its

standard procedure. But this action can be explained by Stephens XII's failure to make a claim for actual cost value. Similarly, while Fireman's Fund obtained estimates on the basis of replacement cost, there is no reason to infer that by doing so it intended to abandon its rights under the repair requirement. Stephens XII provides no persuasive evidence of an intent by Fireman's Fund to excuse compliance with the repair requirement.[15]

                c.      Estoppel.

Stephens XII also contends Fireman's Fund should be prevented from relying on the repair requirement under the doctrine of estoppel because it failed to advise Stephens XII of the requirement. Again, we disagree.

" 'A valid claim of equitable estoppel consists of the following elements: (a) a representation or concealment of material facts (b) made with knowledge, actual or virtual, of the facts (c) to a party ignorant, actually and permissibly, of the truth (d) with the intention, actual or virtual, that the ignorant party act on it, and (e) that party was induced to act on it.' " (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1013.) The requirement of a representation or concealment is not strictly enforced; mere silence may qualify if, under the circumstances, the party to be estopped was under a duty to speak to avoid a misunderstanding. (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1268.) Other, more general formulations have been proposed (see *City of Hollister, supra,* 165 Cal.App.4th at p. 488), but all formulations require that the conduct of the party to be estopped induced action on the part of the complaining party. "Such causation is essential to estoppel." (*Id.,* at p. 487.)

Stephens XII argues that Fireman's Fund should be estopped from denying coverage because it failed to discuss or disclose the policy provisions. But Stephens XII

---

[15] The primary decision cited by Stephens XII in support of its argument, *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, merely recognizes that an insurer may waive the statute of limitations. (*Id.* at pp. 689-690.) Beyond recognizing the general principle of waiver, the decision is of little persuasive force here since it did not attempt to apply the principle to the circumstances before the court. (*Id.* at p. 690.)

20

points to no evidence suggesting that any nondisclosure was the cause of its failure either to make a claim for actual cost value or to make the required repairs. We have no reason to infer that Stephens XII was uninformed about its options under the policy. It is a sophisticated professional owner of real estate; the policy's language is clear and unambiguous; and the company was advised by an insurance broker in its dealings with Fireman's Fund. In short, substantial evidence was not presented demonstrating that Stephens XII was unaware of the repair requirement due to any nondisclosure on the part of Fireman's Fund.[16]

d.  Prejudice.

Stephens XII cites cases holding that an insurer may not assert defenses based on an insured's breach of a policy condition unless the insurer was substantially prejudiced. (*Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303, 305.) The doctrine is ordinarily applied to "procedural" provisions, such as timely notice requirements, rather than substantive provisions, like a repair obligation. (E.g., *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 763.) It is inapplicable here for two reasons. First, by failing to pay for repairs or make a claim for actual cost value, Stephens XII did not breach the terms of the policy; it simply failed to satisfy a condition precedent (the repair requirement) to Fireman's Fund's obligation to pay replacement cost. Second, there would be no way to know until after the payment was made whether Fireman's Fund would be prejudiced by being required to pay replacement cost before the damages were actually repaired. If Stephens XII made the repairs, there would have been no prejudice; but if Stephens XII simply pocketed the money or used it to subdivide or demolish the

---

[16] Indeed, Fireman's Fund at trial sought to prove that Stephens XII understood and appreciated the policy provisions but was precluded from doing so by Stephens XII's objection. Fireman's Fund attempted to introduce evidence of similar insurance claims filed by Stephens & Co. entities under the policy that would have demonstrated the company's awareness of the actual cash value option. Stephens XII moved to exclude the evidence, arguing the other insurance claims were irrelevant. The trial court granted the motion, concluding Stephens XII's "state of mind" was not relevant to the disputed material issues.

21

property, as testimony suggested it might, Fireman's Fund would have been prejudiced by having to pay replacement cost when only actual cost value was required. Accordingly, we cannot say Fireman's Fund was not prejudiced by Stephens XII's conduct.

### e. Repudiation.

Stephens XII's final argument is that Fireman's Fund's denial of coverage should be treated as a repudiation of the policy. But this argument misapplies the doctrine of repudiation. Repudiation of a contract, also known as "anticipatory breach," occurs when a party announces an intention not to perform prior to the time due for performance. (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 137-138; Rest. 2d of Contracts, § 253, com. (a), p. 286.) Fireman's Fund's denial of coverage, coming after the occurrence of the damage for which indemnity was sought, was not a repudiation but instead an ordinary breach by nonperformance.

### 2. The Jury's Award for Lost Business Income Is Properly Construed as a Compensable Award for Lost Rent.

The trial court correctly ruled that Stephens XII was not entitled to be indemnified for lost business income as a result of the March 2008 failed real estate sale since the policy only indemnified loss arising from lost business conducted on the property. Stephens XII does not argue otherwise, but instead argues that the court misinterpreted the special verdict. We agree. As we shall explain, the totality of circumstances surrounding the special verdict leads us to conclude that the jury's business income verdict is properly construed as an award of lost rent during the period of the coverage dispute and litigation. Because reimbursement for such loss is expressly provided under the policy, we conclude that the award must stand.

"When no objection is made that a special verdict is ambiguous or incomplete before the jury is discharged, 'it falls to "the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions." [Citations.] Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct

interpretation.' " (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 542.) We are not bound by the trial court's interpretation of the special verdict. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.)

When interpreting a special verdict, "reference may be made to the pleadings, the evidence and the court's instructions. [Citations.] . . . 'In determining the sufficiency of the verdict the entire record should be searched and all the parts interpreted together, so that if possible a deficiency in one place may be cured by what appears in another.' [Citation.] Accordingly, it is the rule that all reasonable inferences will be indulged on appeal to support, rather than defeat, a jury's verdict." (*Fransen v. Washington* (1964) 229 Cal.App.2d 570, 574.) " 'A verdict should be interpreted so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and the evidence.' " (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223.)

The trial court found the special verdict to be "unambiguous" presumably because the verdict awarded Stephens XII damages for lost business income and denied damages for lost rents. While we acknowledge that the special verdict was not ambiguous on its face, " '[a]n ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence.' " (*Claxton v. Waters* (2004) 34 Cal.4th 367, 381.) " 'Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' " (E.g., *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391.) While, as *Dore* suggests, the issue of latent ambiguities arises most often in the interpretation of contracts, latent ambiguity is a potential characteristic of all writings, including special verdict forms. (See *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2 (*Woodcock*) [recognizing that a special verdict can be latently ambiguous].)

The special verdict here contains such a latent ambiguity. Most telling is the amount of damages awarded. The amount of damages awarded for lost business income, $2,135,936, bears no apparent relationship to the damages sought by Stephens XII under its theory of lost business income as a result of the failed real estate sale. Stephens XII's

damages expert testified that the company lost about $10 million as a result of the failed sale. That figure was premised on a series of assumptions from the specifics of the sale transaction, and none of them gives rise to a plausible calculation of damages approximating $2 million, let alone to the precise figure found by the jury. In other words, the award of $2,135,936 is simply inexplicable under the theory of lost business income urged by Stephens XII at trial.

On the other hand, the award bears a striking correlation to Stephens XII's theory of lost rent. The damages expert testified that Stephens XII was entitled to lost rent calculated at a monthly value of $.30 per square foot. On cross-examination, he admitted that the proposal on which he based his testimony actually called for monthly rent at a rate of $.20 per square foot. In closing argument, Stephens XII's attorney told the jury that a reasonable amount of time for the company to have rented the property would have been one year after the loss, which was 44 months prior to trial. To the dollar, the jury's award of $2,135,936 equals 44 months of rent calculated at a rate of $.20 per square foot. The correspondence is too exact to be coincidental. "Where, as here, a jury's verdict precisely matches an expert's testimony, logic and common sense tells us that the jury accepted the expert's analysis and calculations." (*Orthopedic Systems, Inc. v. Schlein*, *supra*, 202 Cal.App.4th at p. 543.) Because this aspect of the expert's testimony concerned lost rent, rather than lost business income, the jury's monetary award indicates that it accepted the expert's testimony with respect to lost rent, rather than lost business income.

Stephens XII provides a plausible explanation for the jury's classification of lost rent as lost business income. As two witnessed testified at trial, Stephens XII is in the business of leasing property. To the company, lost rent is equivalent to lost business income, at least if the term "business income" is considered colloquially, rather than as defined by the policy. We conclude that the jury disregarded Stephens XII's "lost sale" theory of business income damages and instead awarded 44 months of lost rent.

Stephens XII argues that the award was for lost rent that should be considered under the circumstances to be an award for covered lost business income, and Fireman's

24

Fund argues that it should not. But we find the issue irrelevant. It is clear the jury intended to award lost rents to Stephens XII, and lost rents are allowable under the policy. It does not matter whether these lost rents could also have qualified as lost business income. The special verdict must be interpreted as awarding Stephens XII damages of $2,135,936 for lost rent on the breach of contract cause of action. This interpretation is consistent with our obligation to uphold the verdict if possible. (*All-West Design, Inc. v, Boozer, supra,*183 Cal.App.3d at p. 1223.) Reversal of an ambiguous special verdict is "required" only "[i]f the verdict is hopelessly ambiguous." (*Woodcock*, *supra*, 69 Cal.2d at p. 457.) The special verdict here is far from hopelessly ambiguous.

Fireman's Fund also argues that Stephens XII failed to offer solid evidence establishing lost rents, characterizing its evidence as "speculative at best." On the contrary, the expert testimony presented by Stephens XII was based on a proposal for rent entered into by arm's-length parties. There is no reason to think that the property, which had been leased in the past, could not have been rented had it been repaired. While it may have taken Stephens XII longer than a year to find a tenant, there is nothing unreasonable about the jury's allowance of one year, which was based on the expert's testimony. In short, we find nothing in the award to be improperly speculative.

At oral argument, counsel for Fireman's Fund argued that the trial court's ruling granting a new trial precludes us from upholding an award of lost rents because the court, sitting as a 13th juror, found no evidence to support such an award. This argument misconstrues the new trial order. While it is true the order found "an insufficiency of the evidence to support the award of damages," the ruling must be read in context. The order was based on the same reasoning as the court's grant of JNOV. The JNOV order, in turn, reasoned that the award of *business income damages* was not supported by the evidence because Stephens XII had not presented evidence of recoverable lost business income. The JNOV order had no occasion to consider the sufficiency of the evidence to support an award of lost rents since it found that no such award had been made.

25

B.    The JNOV on the Breach of Covenant Cause Cannot Be Sustained.

The trial court's only basis for vacating the jury's award of damages on the cause of action for breach of the covenant of good faith and fair dealing was its reversal of the jury's awards on the breach of contract cause of action.  Fireman's Fund has provided this court with no argument for affirming the trial court's grant of JNOV on the breach of covenant cause other than the one accepted by the trial court.  We must therefore reverse the trial court's grant of JNOV on the breach-of-covenant cause because we have reversed that court's JNOV on the breach of contract cause.[17]

C.    The Conditional Grant of a New Trial Cannot Be Sustained.

The grant of a new trial, and our review of it, is governed by strict statutory standards.  As explained by the Supreme Court in *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, "The authority of a trial court in this state to grant a new trial is established and circumscribed by statute.  [Citations.]  [Code of Civil Procedure s]ection 657 sets out seven grounds for such a motion:  (1) 'Irregularity in the proceedings'; (2) 'Misconduct of the jury'; (3) 'Accident or surprise'; (4) 'Newly discovered evidence'; (5) 'Excessive or inadequate damages'; (6) 'Insufficiency of the evidence'; and (7) 'Error in law.'

"Before 1965, section 657 only required the trial court to specify whether it was granting the new trial motion on the ground of insufficiency of the evidence.  [Citation.] Amendments enacted in 1965 (modified slightly in 1967) require the trial court to state not only the ground upon which the motion is granted but also the *reasons* for granting the motion on that ground.  Section 657 now provides:  'When a new trial is granted, on

---

[17] We are satisfied that the damages awarded for the breach of the covenant of good faith does not duplicate the damages awarded for breach of contract.  Although both awards cover lost rent, they can be understood to apply to different time periods.  As discussed above, the breach of contract award appears to cover the period through the time of trial. When calculated at the same rate, the damages awarded for the breach of the covenant of good faith constitute exactly nine months of rent, which can be understood to cover an additional period of vacancy following trial while the property is repaired and marketed. This would be consistent with the closing argument of counsel for Stephens XII, who sought bad faith damages in connection with a "period of restoration."

26

all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated. [¶] . . . [¶] . . . [I]f the motion is granted [the order] must state the ground or grounds relied upon by the court, and may contain the specification of reasons. If an order granting such motion does not contain such specification of reasons, the court must, within 10 days after filing such order, prepare, sign and file such specification of reasons in writing with the clerk. . . .'

"As [the Supreme Court] explained in *Mercer v. Perez* (1968) 68 Cal.2d 104, the first case to construe the amended statute, 'it is apparent that in the context of this statute the words "ground" and "reason" have different meanings.' [Citation.] The word 'ground' refers to any of the seven grounds listed in section 657. [Citation.] A statement of grounds that reasonably approximates the statutory language is sufficient. [Citations.] The statement of 'reasons,' on the other hand, should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation. [Citations.]

"Finally, section 657 provides: 'On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons. . . .' There are two exceptions: Orders may not be affirmed on the ground of insufficiency of the evidence or on the ground of excessive or inadequate damages unless that ground is specified in the order. . . .

"California courts have consistently required strict compliance with section 657. Its requirement that the statement of reasons be filed no later than 10 days after the order granting a new trial is jurisdictional, and a statement of reasons filed more than 10 days after the order is ineffective. [Citations.] Substantial compliance with the statute is not sufficient. [Citations.] The statement of reasons must refer to evidence, not ultimate facts. [Citation.] And the appellate court cannot remand the case to permit the trial court to correct an insufficient statement of reasons." (*Oakland Raiders v. National Football League, supra,* at pp. 633-635.)

27

We ordinarily review a motion for a new trial for abuse of discretion, but if the grant of a new trial is premised on an issue of law, de novo review is appropriate. (*Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417.)

As noted above, the trial court's order granting Fireman's Fund a new trial was "to be effective only if [the] ruling on the motion JNOV is vacated or reversed [on appeal]." The court specified three grounds, "insufficiency of the evidence to support the award of damages, that the decision was against the law, and the verdict was against the weight of the evidence." Its statement of reasons was brief: "for the reasons stated in my [written decision granting JNOV]."[18] Our review is circumscribed by this ruling.[19]

The order purports to grant a new trial for the same reasons that the JNOV was granted. Thus, the concerns with the JNOV apply equally to the grant of a new trial. In granting a new trial on the jury's award of replacement cost, the trial court reasoned that Stephens XII was not entitled to recover replacement cost as a matter of law because there was no evidence it had complied with the repair requirement. Although couched in terms of insufficiency of the evidence, this ruling was an interpretation of the terms of the policy. As we have discussed at length, however, Stephens XII is entitled to entry of a conditional judgment awarding replacement cost. Accordingly, the court's reasoning provides no basis for granting a new trial on this issue.

Fireman's Fund made a forceful case in its motion for a new trial that the jury's finding that all of the property damage occurred on or after June 28 was not supported by the evidence. But this was not an argument made in connection with the motion for JNOV. Insufficiency of the evidence cannot be used as a ground for affirming the grant of a new trial when it was not relied upon by the trial court. (§ 657; *Sanchez-Corea v.*

---

[18] Fireman's Fund acknowledges that the trial court "granted the new trial order for the same reasons it granted JNOV" even though Fireman's Fund had moved for a new trial on the additional ground that "the weight of the evidence went against the verdict."

[19] Although the trial court later expanded on its ruling in the order denying Stephens XII's posttrial motion to amend the complaint, because that ruling was issued more than 10 days after the order granting the new trial motion it is "ineffective" and cannot be considered. (*Oakland Raiders v National Football League*, *supra*, 41 Cal. 4th at p. 634.)

*Bank of America* (1985) 38 Cal.3d 892, 905.) While the trial court cited insufficiency of the evidence as one ground for granting a new trial, the scope of our review on that ground is circumscribed by the trial court's statement of reasons. By limiting its reasons to those involved in the JNOV motion, the court made clear that it did not intend a finding of insufficiency of the evidence as to the underlying coverage liability. Allowing appellate review of the underlying coverage liability under these circumstances would render the restrictions under section 657 meaningless. (See *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1695 [for specification of reasons to adequately support appellate review on ground of insufficiency of the evidence, some discussion of evidence is required].)[20]

Similarly, the trial court's ruling on the jury's award of lost business income was that Stephens XII failed to present evidence of any damages recoverable as lost business income. Again, although phrased in terms of insufficiency of the evidence, this ruling constituted an interpretation of the contract. Because the court made no finding that an award of lost rents was unsupported by evidence of their amount or for other reasons, we find no other basis to affirm the grant of a new trial as to the award of lost business income. The order granting a new trial must therefore be vacated.

Finally, in the conclusions of its opening and reply briefs, Stephens XII asks us to direct the trial court to enter an award of attorney fees under *Brandt v. Superior Court* (1985) 37 Cal.3d 813. We decline to do so. Any request for attorney fees must be directed to the trial court in the first instance.

## DISPOSITION

The trial court's order granting judgment notwithstanding the verdict and judgment is reversed, and its orders granting a new trial and awarding costs of suit to Fireman's Fund are vacated. The matter is remanded to the trial court for further

---

[20] In addition, the burden was on Fireman's Fund to raise grounds for supporting the court's new trial order. (*Sanchez-Corea v. Bank of America, supra,* 38 Cal.3d at p. 906.) In its respondents' brief, Fireman's Fund argues only those issues raised by the trial court in the JNOV order as grounds for affirmance of the new trial order.

proceedings consistent with this decision.  The parties shall bear their own costs on appeal.

_____
Humes, P. J.

We concur:


_____
Dondero, J.


_____
Banke, J.


*Stephens & Stephens XII v. Fireman's Fund*
(A135938; A136740)

31

Trial Court:                         San Francisco County Superior Court

Trial Judge:                       Honorable Curtis E.A. Karnow

Counsel for Appellant:          Daniel Upton Smith; Valerie T. McGinty; Nina Grigoryevna Shapirsteyn

Counsel for Amicus Curiae
United Policyholder on behalf
of Appellant:                     Sharon Joellen Arkin

Counsel for Respondent:       Rex S. Heinke; Reginald D. Steer; Ashley Brooke Vinson; Teresa W. Ghali; Danielle Crockett